CHAPMAN ET AL. *v.* CALIFORNIA.

No. 95.   Argued December 7–8, 1966.—Decided February 20, 1967.

*Morris Lavine* argued the cause and filed briefs for petitioners.

*Arlo E. Smith,* Chief Assistant Attorney General of California, argued the cause for respondent.   With him on the brief were *Thomas C. Lynch,* Attorney General, *Doris H. Maier,* Assistant Attorney General, and *Raymond M. Momboisse,* Deputy Attorney General.

MR. JUSTICE BLACK delivered the opinion of the Court.

Petitioners, Ruth Elizabeth Chapman and Thomas LeRoy Teale, were convicted in a California state court

upon a charge that they robbed, kidnaped, and murdered a bartender. She was sentenced to life imprisonment and he to death. At the time of the trial, Art. I, § 13, of the State's Constitution provided that "in any criminal case, whether the defendant testifies or not, his failure to explain or to deny by his testimony any evidence or facts in the case against him may be commented upon by the court and by counsel, and may be considered by the court or the jury." Both petitioners in this case chose not to testify at their trial, and the State's attorney prosecuting them took full advantage of his right under the State Constitution to comment upon their failure to testify, filling his argument to the jury from beginning to end with numerous references to their silence and inferences of their guilt resulting therefrom.[1] The trial court also charged the jury that it could draw adverse inferences from petitioners' failure to testify.[2] Shortly after the trial, but before petitioners' cases had been considered on appeal by the California Supreme Court, this Court decided *Griffin* v. *California*, 380 U. S. 609, in which we held California's constitutional provision and practice invalid on the ground that they put a penalty on the exercise of a person's right not to be compelled to be a witness against himself, guaranteed by the Fifth Amendment to the

---

[1] Excerpts of the prosecutor's argument are reproduced in the Appendix to this opinion.

[2] The trial judge charged the jury:

"It is a constitutional right of a defendant in a criminal trial that he may not be compelled to testify. Thus, whether or not he does testify rests entirely on his own decision. As to any evidence or facts against him which the defendant can reasonably be expected to deny or explain because of facts within his knowledge, if he does not testify or if, though he does testify, he fails to deny or explain such evidence, the jury may take that failure into consideration as tending to indicate the truth of such evidence and as indicating that among the inferences that may be reasonably drawn therefrom those unfavorable to the defendant are the more probable. . . ."

United States Constitution and made applicable to California and the other States by the Fourteenth Amendment.  See *Malloy* v. *Hogan,* 378 U. S. 1.  On appeal, the State Supreme Court, 63 Cal. 2d 178, 404 P. 2d 209, admitting that petitioners had been denied a federal constitutional right by the comments on their silence, nevertheless affirmed, applying the State Constitution's· harmless-error provision, which forbids reversal unless "the court shall be of· the opinion that the error complained of has resulted in a miscarriage of justice." [3] We granted certiorari limited to these questions:

> "Where there is a violation of the rule of *Griffin* v. *California,* 380 U. S. 609, (1) can the error be held to be harmless, and (2) if so, was the error harmless in this case?"   383 U. S. 956–957.

In this Court petitioners contend that both these questions are federal ones to be decided under federal law; that under federal law we should hold that denial of a federal constitutional right, no matter how unimportant, should automatically result in reversal of a conviction, without regard to whether the error is considered harmless; and that, if wrong in this, the various comments on petitioners' silence cannot, applying a federal standard, be considered harmless here.

## I.

Before deciding the two questions here—whether there can ever be harmless constitutional error and whether the error here was harmless—we must first decide whether

---

[3] Cal. Const., Art. VI, § 4½:

"No judgment shall be set aside, or new trial granted, in any case, on the ground of misdirection of the jury, or of the improper admission or rejection of evidence, or for any error as to any matter of pleading, or for any error as to any matter of procedure, unless, after an examination of the entire cause, including the evidence, the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice."

state or federal law governs. The application of a state harmless-error rule is, of course, a state question where it involves only errors of state procedure or state law. But the error from which these petitioners suffered was a denial of rights guaranteed against invasion by the Fifth and Fourteenth Amendments, rights rooted in the Bill of Rights, offered and championed in the Congress by James Madison, who told the Congress that the "independent" federal courts would be the "guardians of those rights."[4] Whether a conviction for crime should stand when a State has failed to accord federal constitutionally guaranteed rights is every bit as much of a federal question as what particular federal constitutional provisions themselves mean, what they guarantee, and whether they have been denied. With faithfulness to the constitutional union of the States, we cannot leave to the States the formulation of the authoritative laws, rules, and remedies designed to protect people from infractions by the States of federally guaranteed rights. We have no hesitation in saying that the right of these petitioners not to be punished for exercising their Fifth and Fourteenth Amendment right to be silent—expressly created by the Federal Constitution itself—is a federal right which, in the absence of appropriate congressional action, it is our responsibility to protect by fashioning the necessary rule.

## II.

We are urged by petitioners to hold that all federal constitutional errors, regardless of the facts and circumstances, must always be deemed harmful. Such a hold-

---

[4] "If they [the first ten amendments] are incorporated into the Constitution, independent tribunals of justice will consider themselves in a peculiar manner the guardians of those rights; they will be an impenetrable bulwark against every assumption of power in the Legislative or Executive; they will be naturally led to resist every encroachment upon rights expressly stipulated for in the Constitution by the declaration of rights." 1 Annals of Cong. 439 (1789).

22

ing, as petitioners correctly point out, would require an automatic reversal of their convictions and make further discussion unnecessary. We decline to adopt any such rule. All 50 States have harmless-error statutes or rules, and the United States long ago through its Congress established for its courts the rule that judgments shall not be reversed for "errors or defects which do not affect the substantial rights of the parties." 28 U. S. C. § 2111.[5] None of these rules on its face distinguishes between federal constitutional errors and errors of state law or federal statutes and rules. All of these rules, state or federal, serve a very useful purpose insofar as they block setting aside convictions for small errors or defects that have little, if any, likelihood of having changed the result of the trial. We conclude that there may be some constitutional errors which in the setting of a particular case are so unimportant and insignificant that they may, consistent with the Federal Constitution, be deemed harmless, not requiring the automatic reversal of the conviction.

### III.

In fashioning a harmless-constitutional-error rule, we must recognize that harmless-error rules can work very unfair and mischievous results when, for example, highly important and persuasive evidence, or argument, though legally forbidden, finds its way into a trial in which the question of guilt or innocence is a close one. What

---

[5] 28 U. S. C. § 2111 provides:

"On the hearing of any appeal or writ of certiorari in any case, the court shall give judgment after an examination of the record without regard to errors or defects which do not affect the substantial rights of the parties."

Fed. Rule Crim. Proc. 52 (a) provides:

"Any error, defect, irregularity or variance which does not affect substantial rights shall be disregarded."

See also Fed. Rule Civ. Proc. 61.

harmless-error rules all aim at is a rule that will save the good in harmless-error practices while avoiding the bad, so far as possible.

The federal rule emphasizes "substantial rights" as do most others. The California constitutional rule emphasizes "a miscarriage of justice," [6] but the California courts have neutralized this to some extent by emphasis, and perhaps overemphasis, upon the court's view of "overwhelming evidence." [7] We prefer the approach of this Court in deciding what was harmless error in our recent case of *Fahy* v. *Connecticut*, 375 U. S. 85. There we said: "The question is whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction." *Id.*, at 86–87. Although our prior cases have indicated that there are some constitutional rights so basic to a fair trial that their infraction can never be treated as harmless error,[8] this statement in *Fahy* itself belies any belief that all trial errors which violate the Constitution automatically call for reversal. At the same time, however, like the federal harmless-error statute, it emphasizes an intention not to treat as harmless those constitutional errors that "affect substantial rights" of a party. An error in admitting plainly relevant evidence which possibly influenced the jury adversely to a litigant cannot, under *Fahy*, be conceived

---

[6] The California statutory rule, like the federal rule, provides that "[a]fter hearing the appeal, the Court must give judgment without regard to technical errors or defects, or to exceptions, which do not affect the substantial rights of the parties." Cal. Pen. Code § 1258.

[7] The California Supreme Court in this case did not find a "miscarriage of justice" as to petitioner Teale, because it found from "other substantial evidence, [that] the proof of his guilt must be deemed overwhelming." 63 Cal. 2d, at 197, 404 P. 2d, at 220.

[8] See, *e. g.*, *Payne* v. *Arkansas*, 356 U. S. 560 (coerced confession); *Gideon* v. *Wainwright*, 372 U. S. 335 (right to counsel); *Tumey* v. *Ohio*, 273 U. S. 510 (impartial judge).

of as harmless. Certainly error, constitutional error, in illegally admitting highly prejudicial evidence or comments, casts on someone other than the person prejudiced by it a burden to show that it was harmless. It is for that reason that the original common-law harmless-error rule put the burden on the beneficiary of the error either to prove that there was no injury or to suffer a reversal of his erroneously obtained judgment.[9] There is little, if any, difference between our statement in *Fahy* v. *Connecticut* about "whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction" and requiring the beneficiary of a constitutional error to prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained. We, therefore, do no more than adhere to the meaning of our *Fahy* case when we hold, as we now do, that before a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt. While appellate courts do not ordinarily have the original task of applying such a test,[10] it is a familiar standard to all courts, and we believe its adoption will provide a more workable standard, although achieving the same result as that aimed at in our *Fahy* case.

### IV.

Applying the foregoing standard, we have no doubt that the error in these cases was not harmless to petitioners. To reach this conclusion one need only glance at the prosecutorial comments compiled from the record by petitioners' counsel and (with minor omissions) set forth in the Appendix. The California Supreme Court

---

[9] See generally 1 Wigmore, Evidence § 21 (3d ed. 1940).

[10] Cf. *Woodby* v. *Immigration Service*, 385. U. S. 276.

fairly summarized the extent of these comments as follows:

> "Such comments went to the motives for the procurement and handling of guns purchased by Mrs. Chapman, funds or the lack thereof in Mr. Teale's possession immediately prior to the killing, the amount of intoxicating liquors consumed by defendants at the Spot Club and other taverns, the circumstances of the shooting in the automobile and the removal of the victim's body therefrom, who fired the fatal shots, why defendants used a false registration at a motel shortly after the killing, the meaning of a letter written by Mrs. Chapman several days after the killing, why Teale had a loaded weapon in his possession when apprehended, the meaning of statements made by Teale after his apprehension, why certain clothing and articles of personal property were shipped by defendants to Missouri, what clothing Mrs. Chapman wore at the time of the killing, conflicting statements as to Mrs. Chapman's whereabouts immediately preceding the killing and, generally, the overall commission of the crime." 63 Cal. 2d, at 196, 404 P. 2d, at 220.

Thus, the state prosecutor's argument and the trial judge's instruction to the jury continuously and repeatedly impressed the jury that from the failure of petitioners to testify, to all intents and purposes, the inferences from the facts in evidence had to be drawn in favor of the State—in short, that by their silence petitioners had served as irrefutable witnesses against themselves. And though the case in which this occurred presented a reasonably strong "circumstantial web of evidence" against petitioners, 63 Cal. 2d, at 197, 404 P. 2d, at 220, it was also a case in which, absent the constitu-

tionally forbidden comments, honest, fair-minded jurors
might very well have brought in not-guilty verdicts.
Under these circumstances, it is completely impossible for
us to say that the State has demonstrated, beyond a rea-
sonable doubt, that the prosecutor's comments and the
trial judge's instruction did not contribute to petitioners'
convictions. Such a machine-gun repetition of a denial
of constitutional rights, designed and calculated to make
petitioners' version of the evidence worthless, can no
more be considered harmless than the introduction
against a defendant of a coerced confession. See, *e. g.,*
*Payne* v. *Arkansas,* 356 U. S. 560. Petitioners are en-
titled to a trial free from the pressure of unconstitutional
inferences.

*Reversed and remanded.*

## APPENDIX TO OPINION OF THE COURT.

### Argument and Comments by the Prosecutor on the Failure of the Defendants to Take the Witness Stand

"Now, ladies and gentlemen, I don't know which one
of these weapons was purchased first, I don't know that
it particularly makes any difference, but as you know,
we have had no testimony at all in that regard, in fact,
I might add that the only person or persons that could
give testimony in that regard would be, of course, the
defendants themselves.

"Now, this, there's no question about what this repre-
sents, or for the record here, no question in your minds,
this is not the weapon that Ruth Elizabeth Chapman
purchased in Reno, Nevada, on October the 12th, 1962.
I don't know where that weapon is, ladies and gentlemen,
and you don't know where it is, you've heard no testi-
mony from the stand at all, and once again, the only

person or persons that could tell us about where the original .22 caliber Vestpocket is today would be one or the other of the defendants or both.

"This would indicate that there was no small struggle—it would indicate that the body, almost lifeless, was dragged or left in some fashion which would cause a shirt or an article of clothing to tear, one or the other. Once again, ladies and gentlemen, I don't know, I wasn't out there, you were not out there. You heard no testimony on the stand. The only individuals that could give you that information would be the defendants, either one or both of them, Thomas Leroy Teale and Ruth Elizabeth Chapman. And of course you know that you have not heard from them.

"Now, I will comment throughout my entire opening argument to you in reference to the fact that neither one of these defendants has seen fit to go up, raise their right hand, take that witness stand, tell you ladies and gentlemen of the jury exactly what did occur, explain to you any facts or details within their knowledge so that you would know. You would not have to—by His Honor's instructions you can draw an adverse inference to any fact within their knowledge that they couldn't testify to, and they have not subjected themselves, either one or both, to cross-examination. Now, that is—so there is no question in your mind, once again with reference to a defendant taking the stand, none—you are—you or I or anyone else is not required under our legal system in these United States and under the Constitution, you can not be made to testify against yourself or for yourself, as far as that goes.

"So, it is a Constitutional right, and both of these defendants have seen fit to avail themselves of that Constitutional right, but I say to you ladies and gentlemen, there are many things in this case, and I will try to point

them out to you, at least some, probably not all, that these defendants are in a position to take that stand and to testify under oath and give you facts concerning. They have not seen fit to avail themselves of that opportunity.

"Now whether or not Mr. Teale had any other money at the time or was in the habit of concealing his money in different departments, I don't know, and ladies and gentlemen, you don't know, because you have not had any testimony from that witness stand, and the only person that could clear this up for us ladies and gentlemen is the defendant Thomas Leroy Teale. Ladies and gentlemen, he has not seen fit to tell you about that. But certainly we know that bogus checks are being written, and as I recall we know that—I don't—we may infer, if you wish to believe there is an inference which Mr. Teale could have cleared up, that that was all the money that he had, and he didn't clear it up, so you may draw an adverse inference from that, that that was all the money he had, or in fact that he—at that time he was in desperate need of funds, and you know that through some kind of a discussion between these two defendants in regard to Mr. Teale shooting dice, that this was all he had.

"Now, ladies and gentlemen, in reference to the weapons being purchased in Reno, Nevada on October 12th, you have heard, ladies and gentlemen, no testimony, and you will recall clearly, you are going to have some difficulty, you really are in reference to what is and what isn't evidence in this case, and believe me I have a few comments to say on that a little later on, but if you will recall as far as evidence is concerned of the truth of anything at all, you don't have any evidence on why

these—why these pistols were purchased. Why did Ruth Elizabeth Chapman buy two weapons? Well, you do recall that she told on one occasion that she had had a pistol stolen from her vehicle, her automobile, when she was taking a little trip across country, you remember that testimony, and you can rely on the testimony that you actually hear, ladies and gentlemen, from the stand. She told that, and of course you can only rely that she told the gentleman that, that she had had another one stolen, and so that she needed one to replace it. But why two, ladies and gentlemen? You don't need two. If she is going to be attacked she wasn't going to use one in each hand I assume to defend herself, and there is another area, ladies and gentlemen, besides this that I mentioned to you before, that since you have no testimony from the stand, you must surmise from all facts and circumstances as to the exact reason why they were purchased, because the only one in this room that could tell you why these guns were purchased is either one or both of the defendants. Certainly the defendant Ruth Elizabeth Chapman could tell you, she could tell you under oath, she could subject herself to cross-examination, and she could tell you then and it would be evidence before you. Once again she has not chosen to do this. So any inference you may draw therefrom will be an adverse inference under the circumstances, and under the instructions of the Court. . . .

"So, we know, ladies and gentlemen, that they had the motive, we know that they had the means, we know that they had the opportunity. We also know that they were at that scene, ladies and gentlemen, they were with that man just a matter of minutes before he was shot in the head three times with a gun similar to People's Exhibit No. 12. Now, if they weren't there, and I think the evidence clearly shows they were, scientific evidence,

that we'll talk about a little later. Once again, why don't they come up and raise their right hand and tell you about it?

"To me they are charged with serious crimes, ladies and gentlemen. They can come up and testify and then it will be evidence for you to consider in this case. If they had just come up and told you about this, because they were there. If they left the Spot Club and just went on their way, well, of course they didn't, the evidence clearly shows they didn't, but you may draw the adverse inference from their refusal to come before you and raise that right hand and incidentally, of course, subject themselves to cross-examination.

"I think it is not an unreasonable inference to infer at this time if the defendants were drinking beer earlier in the evening in Croce's, it's not unreasonable to infer they continued drinking the same thing, therefore the two glasses remaining that had been washed, but not put up were the defendants'. I don't know, it is an inference, I wasn't there, we have had no testimony whatsoever as to what they were drinking at the Spot Club, once again, neither one of the defendants have seen their way clear to come up and tell you what they were drinking if it was beer.

"So you can see that whichever one of these defendants shot him, and once again, ladies and gentlemen, here is an area that I don't know who shot him, and you don't know who shot him, because we have had no testimony from that witness stand to tell you who shot him, and the only two persons in this courtroom that could tell you which one of them it was that shot him are the two defendants; but once again, they have both decided that they will not get up and raise their right

hand and testify in this regard and subject themselves to cross-examination, so all we know is that one of them shot him.

"We don't know the time here, it doesn't say. We don't have any testimony, ladies and gentlemen, in this regard, and I might say once again in reference to this last, the use of the name, T. L. Rosenthal, Mr. and Mrs., we don't know why, ladies and gentlemen, that name was used. We don't know why, ladies and gentlemen, that UZV 155—was 156 originally on here. You don't know that, and I don't, because we haven't had the testimony from the witness stand on it. Now we know it is in the handwriting of Ruth Elizabeth Chapman, and there is no question about that. She wrote it. It could be evidence, ladies and gentlemen, for you. It could be evidence as to why she wrote that name, and why that five was changed to a six. We could have it. But we don't, because either one or both of the defendants, neither one, have even seen fit to take the stand and to testify in that regard. Then this would be evidence that you can consider. But also ladies and gentlemen, subject to taking the oath and subject to cross-examination.

"We see it here in Mountain View, the Mountain View Motel, the name of Teale, but we don't have the testimony of the defendants and ladies and gentlemen they are the only ones here in this case that could get up there and tell you why they used a phony name, two hours after the crime and why they didn't put the correct license down and whatever inference you draw you are permitted to draw since they do not choose to tell you an adverse interest, and I would say, ladies and gentlemen, that it is an adverse interest to the defendants. It shows a consciousness of guilt.

"Now, ladies and gentlemen, what is this—first of all, 'I thought I'd better let you know that Tom arrived here today and we're going south tomorrow'? Now, what does that mean? Well, I think without saying a great deal more about it that each one of you can certainly infer as to what it very readily could mean, especially if one has in fact committed a robbery and kidnapped someone from the premises and that individual has ended up dead, shot three times in the head. And further, ladies and gentlemen, the only other thing I can say about it is this, who can really tell you and who could have told you from evidence, from the witness stand, what that letter meant? Well, the only one is Ruth Elizabeth Chapman, ladies and gentlemen. If it didn't mean what you can reasonably infer that it means, then I say, ladies and gentlemen, she could have come up here and testified, gotten on the witness chair. We have had many witnesses in this case, no one I would assume more interested than Ruth Elizabeth Chapman, or the co-defendant, neither one took the stand. She in no way, nor has there been any way, ladies and gentlemen, any kind of evidence that has actually been admitted for the truth of the evidence, in no way is there any evidence as to why she wrote that letter, and what she meant by 'Tom is arriving today and we're going south.' Once again, she did not choose to tell you. So, we may only infer, and this will be, of course, you will have to in your final analysis draw any inferences from that that you feel are appropriate and are proper—

"He was a fugitive from justice, and he knew he was a fugitive from justice, and he never—let's face it, there were four F.B.I. agents and these fellows are professional and they know what they are doing and one of them had a gun out and he never had an opportunity

to use it, and none of us here will ever know from all the testimony, from the actual testimony on the stand why he had the weapon with him fully loaded, because Mr. Teale has never taken the stand in this case and testified for you. These things are things only within his knowledge, ladies and gentlemen. If there is any fact in this case of any relevancy of any importance it is within the knowledge of a defendant, and they chose not to take the stand and tell you about it, where incidentally they are under oath and can be cross-examined. You may draw an adverse inference from the fact that they do not take it. I think the inference is very clear, too, why they had this weapon here and why he never—why it was fully loaded. Remember there was never an opportunity to use it. The weapon was purchased by Ruth Elizabeth Chapman. Now when he is apprehended and fleeing from the State he had it with him and it was fully loaded. Once again, I don't know where the original is here, and you know the only two that can tell us where that is.

"Now, you recall also that when Mr. Basham took him back in, was fingerprinting him, etc., he told him he was wanted in California and no one mentioned anything about Lodi, and he said that he would waive extradition, and he also did say he said, 'They will have a hard time proving I was there.' And Teale himself did mention Lodi. Well, I don't know what he meant by that statement. I certainly can draw my own conclusion, and you sure will draw yours as the triers of the facts and the judges of the facts, ladies and gentlemen, but once again Mr. Teale did not take the stand and testify under oath in this case, and Mr. Teale has not desired to take the stand and explain what he meant by it. He didn't have to, of course, but once again you can draw whatever inferences you may feel, and the law is clear that

you may draw an adverse—where a defendant does not explain and he does not choose to take the stand and explain it to you you can draw an adverse inference.

"Photographs. You've seen them, ladies and gentlemen, but as you recall the doctor now is pointing, and this is the picture of the deceased, the back of his head, as to where he was shot in the back of the head, you recall the other one as to where he was shot in the side of the head, right here on the left in the general area of where the glasses would be, I think it's a most reasonable inference, ladies and gentlemen. Now, once again we have had no testimony except what would seem clearly logical from the experts, the way the body was found, where he'd been shot, what he'd been shot with, and the position of the glasses in relation to the body at the death scene, we had no other testimony. Certainly none from the defendants in this case.

". . . Agent Gilmore has drawn and made some notations in reference to where that blood was located, blood found on these shoes. Now, all we know, ladies and gentlemen, as far as evidence in this case is concerned, is that these shoes belonged to Ruth Elizabeth Chapman and they were in her possession when she was apprehended in St. Joseph, Missouri, and why do I say that's all you know? That's all you may take into consideration, ladies and gentlemen, because we have no other testimony on this witness stand in relation to any of these articles of clothing that are actually admitted into evidence.

"You have two box lids, two of them, and you've heard the questions concerning them, they would indicate that they were sent to a Mrs. Howard Smith at 2206 Castle Avenue, St. Joseph, Missouri, and I believe it was on

the 11th of October, says from Thomas Teale, 1105 Del Norte, Eureka, California, they both say essentially the same thing, 10-11, there's no year, but I think we can surely infer it was in 1962, and apparently from Reno.

"Now, ladies and gentlemen, there's been a lot of talk, suggestion, and whatever you want to call it, I'll call it a smoke screen, in reference to these two lids that came off, and we'll assume there was a box underneath them, I don't think there's any question about that. Where have you ever heard from that witness stand, ladies and gentlemen, what was ever in those boxes? Now, you've heard some self-serving declarations that are not admitted into evidence because they come through someone else who in some fashion gets testimony before you, but no cross-examination of the original party who is giving that kind of testimony, and you can't consider it.

.        .        .        . .        .

"Thank you, Your Honor. Counsel has interjected himself into this, and he'll have every opportunity to make his own comments, and I'm sure he'll most adequately express himself when the time comes. I'm telling you, ladies and gentlemen, that the only evidence that you have is that you have two box tops. Now, he's just suggested to you, so I'll answer this ahead of time, but the evidence is clear that Mr. Sperling packed these boxes, but you will recall Mr. Sperling was not at the original scene when they were taken. Maybe it isn't unusual to infer there may have been clothes, but what I'm getting at is this is what clothing? You don't even know there was clothing in them when they were shipped. It could have been other household articles. And even if we assume it was clothing, and that's not unreasonable because basically these are the items we found and brought back with us to Lodi, we don't know which clothing she shipped at this time. Couldn't this be cleared up for us, though? It could be cleared up so

easily. Ruth Elizabeth Chapman is sitting right over here, she is one of the defendants in this case and she is the one certainly if anyone, if anyone in this room, or in this state knows what was in those boxes she is the one, but once again she did not take the stand, raise her right hand, and tell you about that. She didn't take the stand at all, ladies and gentlemen, she could have come up and told us exactly what articles were sent, so you may draw any inferences from that that you wish to, as long as they are reasonable.

.    .    .    .    .

"Now, anything that—is clearly, and I'm sure you know by now and I don't have to repeat it too often, anything in this case that Mr. Teale could get up here now, he don't have to get up here, but all of the things that have been said in this trial and all of the physical evidence and the testimony, he's right here in Court and could he not get up and if there is anything to be said he has the opportunity to say it. Otherwise, you may draw the adverse inference from the fact that he doesn't get up there and tell you about it, and that, ladies and gentlemen, is his defense. Mr. Fransen said in the beginning that what happened in this case is not as the prosecution described it. That the facts will show an entirely different version. Well, I haven't heard any facts, ladies and gentlemen, that show an entirely different version.

.    .    .    .    .

"We went through a business with a—dress. We held it up, and then we pointed out the one that she's wearing now, and frankly, ladies and gentlemen, the only one in the Court room that can tell you whether or not it is the same dress is Ruth Elizabeth Chapman, because you know from the evidence no one has ever had an opportunity to examine that dress to see whether it has been dry cleaned, whether or not it was purchased—when

it was purchased or the labels on it or anything else. All that has been done in this thing is to wear a blue knit dress, ladies and gentlemen, which is similar to the one that—she in fact apparently wore on that night.

"So, I suppose that just through the wearing of it, having it in Court, it is hoped that you will draw something from it, which I have heard no testimony on the stand, except that it looks like or is similar to it. . . .

"But what she told that doctor is not evidence in this case, and yet you know. that repeatedly and over and over and over again Mr. Johnson in every way that he could, he would get the story again before you. Now, why? You know why. He did it because he hopes that you wouldn't forget it, although he could put it and make it evidence in this case, which it is not, and if you put Ruth Elizabeth Chapman up on that stand to testify, so it is one way of doing, ladies and gentlemen, if you are going to be taken in by it, indirectly what you can't do directly, because there is no other way that he can get that thing before you without putting her up on that stand.

"But she gave a story on the night of the 17th and early hours of the 18th. She was in San Francisco. Now, why pick on that date so specifically if you are not—if not to beware of that date, that you want to beware. Well, he says, 'You have given two different stories. Do you have problems with blackouts or excessive drinking', and she says 'No.' And I tell you, ladies and gentlemen, that anybody, and there is no evidence to the contrary in this case, if you don't honestly remember what occurred and you know, you are in a situation where there is a fugitive warrant and you have just been arrested and you in all honesty don't remember where you were, that is the first thing that you are going to say. You're not going to sit up and trump up excuses

and make out a story which you know to be a lie about specific dates and times. And, ladies and gentlemen, there is no legal evidence before you that it is anything to the contrary, because the only one now that can come up and tell you has not seen fit to do so.

"... Mr. Johnson would have you believe that everything she said was the truth. I think there are some instances that indicate already—I have indicated some, the purpose of the guns, two different ideas there as to why they were purchased, but that is the only legal purpose for that. So it's not evidence, although Mr. Johnson again I say argued and referred to it as though it was. We have no evidence from the lips of Mrs. Chapman. Now, as Mr. Ferguson told you, it is their constitutional right, and I won't go into that again, because I think he handled it very clearly as well as the others, but that is within her right to do as she sees fit. But, you can consider it for the purposes and under the circumstances that Mr. Ferguson indicated a number of times.

"Originally when Dr. Winkler examined her on the 31st, I believe it was, of October, 1962, she told him that she had forgotten after the first shot was fired, after the first shot was fired. Since that time what has happened? The amnesia, or disassociative state, or disassociative reaction, which ever way you want to look at it, psychiatrically or otherwise, seems to have backed up from Dillard Road back up to the Spot Club, back up down Highway 99 south to just outside of Croce's, and by the time we get through cross-examining Dr. Sheuerman it even backed in to Croce's. A vague area. Very interesting. We could have put it on, put the statement in. It's evidence? It's not. Again, the sanctity and

worthiness of evidence would have to come from her lips, hers on the stand here. Why? Here again, because witnesses would be under oath again, and I repeat, and I repeat for emphasis, they would have to be under oath subject to cross-examination before your very eyes so that you could evaluate it. Oh yes. She said this and she said that. Who said it? Who said it? Ruth Elizabeth Chapman on the stand? No. Dr. Sheuerman said that she said it. Dr. Winkler said that she said. Mr. Johnson said that she said. Well, it's an interesting thing that the only witnesses who weren't here, or weren't on the stand to be cross-examined, the only witnesses who are alive today to the perpetration of these offenses, are these two defendants. That's all. They don't have to take the stand. That's been gone over many times, but you know it would be a fine thing, very fine deed if persons who perpetrated offenses gave a story, put a story on by somebody else, have somebody else speak for you—wouldn't it? It would be a very interesting thing. You would never have the benefit of evaluating their credibility. This is what Mr. Johnson would have you believe that we should have done. Monday morning quarterbacking. And I submit to you—you know, you— you have heard much about lawyers being referred to as 'mouthpieces.' It's actually a very rare thing, really, that that type of appellation is applicable to lawyers really. But, I think you have seen a demonstration here, and I'm not saying it in rancor, not anything of it at all, because this is a demonstration where actually Ruth Elizabeth Chapman is speaking through Mr. Johnson. A 'mouthpiece.'

.        .        .        .

"Maybe there is another reasonable one, other than the fact that it was Adcock's blood, because all three who were in the car had type A. Maybe there is, but

you haven't heard it. You haven't heard any reasonable explanation of that. So, you can draw an adverse inference that it was Billy Dean Adcock's blood. . . .

"Mr. Johnson said these several things which I will go over again. The evidence showed here that she bought two guns for Teale. What evidence? No witness on the stand got up there and said specifically under oath, and the only one that could do it would be Elizabeth Chapman herself. This is hearsay, what she told somebody else for the sole purpose of determining what her state of mind was at the time. It's not evidence. There's some evidence from her own lips through Dennis Mack as to the reason she bought the gun, which is different than what she said otherwise. Mr. Johnson said the evidence shows there was an argument in Fresno. Here again I would say, 'What evidence?' The next one—there are only two people there to that argument, and the only way it would be evidence, or testimony in this case, would be if either one or both of them got up there and said there was an argument. They chose not to do it. You can draw an adverse inference that that being within their knowledge, that they could explain, whether it was or not. You can draw an inference that it wasn't the type of argument that Mr. Johnson claims the evidence shows, because the evidence doesn't show that at all.

"So far as the motive is concerned for the murder in a perpetration of a robbery, the motive was set, to gain for their own desires and lusts and so forth, to gain from it. It was a crime of gain, and perhaps another thing too, in deciding—we don't know who pulled the trigger— we may never know. The defendants haven't indicated it, except through Teale in one—Mr. Vowell's testimony, as to what Mr. Teale said, but that is not admissible

against, and you shouldn't consider it against, Ruth Elizabeth Chapman, but maybe the circumstances of who pulled the trigger might have been a factor that might have been important to you. Only two people know. They didn't tell you. That is the way they want to proceed. But nonetheless, you can consider that too.

. . . . .

"So, in considering what happened here as to why this person was killed, you see you can weigh these things and decide what the motive was. You might have had some help in deciding this very difficult task from the very only two people remaining who were at the scene, but in their best judgment they didn't choose to get up and tell you about it, which you certainly can consider that fact that they did not in the light of using your reason as I have indicated here too.

. . . . .

"You know that somebody shot Billy Dean Adcock, and you know that it was either—it was one or even both of these defendants, in view of your verdict, but which one you don't know. Now, this is something that perhaps might have been of help to you in deciding what punishment to mete out, whether both should be punished equally in this case, or whether there should be some distinction between the two. It might have been helpful to know who pulled that trigger, for if it was Ruth Elizabeth Chapman you could well deduce that it was either her intoxication or emotional stress or a jealousy of Teale, or anger, and a lot of things other than the motive to destroy a witness; whereas, with respect to Mr. Teale it would seem to be a logical thing to conclude that he wanted to get rid of the only eyewitness. Differences there, you see. But you don't know. You don't know whether they did it in consort [*sic*]. You don't know that as far as pulling the trigger. But, this is

a factor which has not been brought to light, and you can consider that factor which has not been, from the standpoint there have been two people that might have explained that.

.           .           .           .           .

"I have gone into the statement here and why it hasn't been presented. If you are going to decide things such as character and sympathy, the law says you may take into consideration, how can you do it by a statement? Now, we are talking about this phase of the case. This now. You like to know that persons get—if there is something about their character that they can tell you, or something about their background that they can tell you, you like to hear it from them, because you have a very serious and difficult task, and the fact that they chose to rest upon whatever evidence there is here in the case in chief is something that you can consider in deciding whether or not they had been fair with you.

"This is the chance that they take by not having taken the stand."

Mr. Justice Stewart, concurring in the result.

In devising a harmless-error rule for violations of federal constitutional rights, both the Court and the dissent proceed as if the question were one of first impression. But in a long line of cases, involving a variety of constitutional claims in both state and federal prosecutions, this Court has steadfastly rejected any notion that constitutional violations might be disregarded on the ground that they were "harmless." Illustrations of the principle are legion.

When involuntary confessions have been introduced at trial, the Court has always reversed convictions regardless of other evidence of guilt. As we stated in *Lynumn* v. *Illinois*, 372 U. S. 528, 537, the argument that the error in admitting such a confession "was a harmless one . . . is an impermissible doctrine." That conclu-

sion has been accorded consistent recognition by this Court. *Malinski* v. *New York,* 324 U. S. 401, 404; *Payne* v. *Arkansas,* 356 U. S. 560, 568; *Spano* v. *New York,* 360 U. S. 315, 324; *Haynes* v. *Washington,* 373 U. S. 503, 518–519; *Jackson* v. *Denno,* 378 U. S. 368, 376–377. Even when the confession is completely "unnecessary" to the conviction, the defendant is entitled to "a new trial free of constitutional infirmity." *Haynes* v. *Washington, supra,* at 518–519.[1]

When a defendant has been denied counsel at trial, we have refused to consider claims that this constitutional error might have been harmless. "The right to have the assistance of counsel is too fundamental and absolute to allow courts to indulge in nice calculations as to the amount of prejudice arising from its denial." *Glasser* v. *United States,* 315 U. S. 60, 76. That, indeed, was the whole point of *Gideon* v. *Wainwright,* 372 U. S. 335, overruling *Betts* v. *Brady,* 316 U. S. 455. Even before trial, when counsel has not been provided at a critical stage, "we do not stop to determine whether prejudice resulted." *Hamilton* v. *Alabama,* 368 U. S. 52, 55; *White* v. *Maryland,* 373 U. S. 59, 60.

A conviction must be reversed if the trial judge's remuneration is based on a scheme giving him a financial interest in the result, even if no particular prejudice is shown and even if the defendant was clearly guilty. *Tumey* v. *Ohio,* 273 U. S. 510, 535. To try a defendant in a community that has been exposed to publicity highly

---

[1] None of these decisions suggests that the rejection of a harmless-error rule turns on any unique evidentiary impact that confessions may have. *Haynes* v. *Washington,* 373 U. S. 503, specifically contradicts that notion. In addition to the confession found inadmissible by this Court, the defendant in *Haynes* had given two prior confessions, the admissibility of which was not disputed, and "substantial independent evidence" of guilt existed. The Court accepted the prosecution's contention that the inadmissible confession played little if any role in the conviction.

adverse to the defendant is *per se* ground for reversal of his conviction; no showing need be made that the jurors were in fact prejudiced against him. *Sheppard* v. *Maxwell,* 384 U. S. 333, 351–352; cf. *Rideau* v. *Louisiana,* 373 U. S. 723, 727. See also *Estes* v. *Texas,* 381 U. S. 532, 542–544; 562–564 (WARREN, C. J., concurring); 593–594 (HARLAN, J., concurring).

When a jury is instructed in an unconstitutional presumption, the conviction must be overturned, though there was ample evidence apart from the presumption to sustain the verdict. *Bollenbach* v. *United States,* 326 U. S. 607, 614–615. Reversal is required when a conviction may have been rested on a constitutionally impermissible ground, despite the fact that there was a valid alternative ground on which the conviction could have been sustained. *Stromberg* v. *California,* 283 U. S. 359, 367–368; *Williams* v. *North Carolina,* 317 U. S. 287, 292. In a long line of cases leading up to and including *Whitus* v. *Georgia,* 385 U. S. 545, it has never been suggested that reversal of convictions because of purposeful discrimination in the selection of grand and petit jurors turns on any showing of prejudice to the defendant.

To be sure, constitutional rights are not fungible goods. The differing values which they represent and protect may make a harmless-error rule appropriate for one type of constitutional error and not for another. I would not foreclose the possibility that a harmless-error rule might appropriately be applied to some constitutional violations.[2] Indeed, one source of my disagreement with the

---

[2] For example, quite different considerations are involved when evidence is introduced which was obtained in violation of the Fourth and Fourteenth Amendments. The exclusionary rule in that context balances the desirability of deterring objectionable police conduct against the undesirability of excluding relevant and reliable evidence. The resolution of these values with interests of judicial economy might well dictate a harmless-error rule for such violations. Cf. *Fahy* v. *Connecticut,* 375 U. S. 85, 92 (dissenting opinion).

Court's opinion is its implicit assumption that the same harmless-error rule should apply indiscriminately to all constitutional violations.

But I see no reason to break with settled precedent in this case, and promulgate a novel rule of harmless error applicable to clear violations of *Griffin* v. *California*, 380 U. S. 609.[3] The adoption of any harmless-error rule, whether the one proposed by the Court, or by the dissent, or some other rule, commits this Court to a case-by-case examination to determine the extent to which we think unconstitutional comment on a defendant's failure to testify influenced the outcome of a particular trial. This burdensome obligation is one that we here are hardly qualified to discharge.

A rule of automatic reversal would seem best calculated to prevent clear violations of *Griffin* v. *California*. This case is one in which the trial occurred before the *Griffin* decision but which was not final on appeal until afterwards, so the doctrine of prospectivity announced in *Tehan* v. *Shott*, 382 U. S. 406, does not reach it. But the number of such cases is strictly limited. Prosecutors are unlikely to indulge in clear violations of *Griffin* in the future, and if they do I see no reason why the sanction of reversal should not be the result.

For these reasons I believe it inappropriate to inquire whether the violation of *Griffin* v. *California* that occurred in this case was harmless by any standard, and accordingly I concur in the reversal of the judgment.

MR. JUSTICE HARLAN, dissenting.

The Court today holds that the harmlessness of a trial error in a state criminal prosecution, such error

---

[3] Earlier this Term, in *O'Connor* v. *Ohio*, 385 U. S. 92, we reversed a conviction on the basis of *Griffin* v. *California*, 380 U. S. 609, without pausing to consider whether the comment on the defendant's silence might have been harmless error under the rule the Court announces today, or any other harmless-error rule.

46.

resulting from the allowance of prosecutorial comment barred by the Fourteenth Amendment, must be determined under a "necessary rule" of federal law. The Court imposes a revised version of the standard utilized in *Fahy* v. *Connecticut,* 375 U. S. 85, on state appellate courts, not because the Constitution requires that particular standard, but because the Court prefers it.

My understanding of our federal system, and my view of the rationale and function of harmless-error rules and their status under the Fourteenth Amendment, lead me to a very different conclusion. I would hold that a state appellate court's reasonable application of a constitutionally proper state harmless-error rule to sustain a state conviction constitutes an independent and adequate state ground of judgment. Believing this to be the situation here, I would dismiss the writ. *Viator* v. *Stone,* 336 U. S. 948.

I.

The key to the Court's opinion can, I think, be found in its statement that it cannot "leave to the States the formulation of the authoritative laws, rules, and remedies designed to protect people from infractions by the States of federally guaranteed rights," and that "in the absence of appropriate congressional action" the Court must fashion protective rules. The harmless-error rule now established flows from what is seemingly regarded as a power inherent in the Court's constitutional responsibilities rather than from the Constitution itself. The Court appears to acknowledge that other harmless-error formulations would be constitutionally permissible. It certainly indicates that Congress, for example, could impose a different formulation.[1]

I regard the Court's assumption of what amounts to a general supervisory power over the trial of federal

[1] For myself, I intimate no view on congressional power with respect to state courts in this regard.

constitutional issues in state courts as a startling constitutional development that is wholly out of keeping with our federal system and completely unsupported by the Fourteenth Amendment where the source of such a power must be found. The Fourteenth Amendment guarantees individuals against invasions by the States of fundamental rights, *Palko* v. *Connecticut,* 302 U. S. 319, and under more recent decisions of this Court some of the specifics of the Bill of Rights as well. See, *e. g.,* in the context of this case, *Malloy* v. *Hogan,* 378 U. S. 1; *Griffin* v. *California,* 380 U. S. 609. It thus serves as a limitation on the actions of the States, and lodges in this Court the same power over state "laws, rules, and remedies" as the Court has always had over the "laws, rules, and remedies" created by Congress. This power was classically described by Chief Justice Marshall in *Marbury* v. *Madison,* 1 Cranch 137, 178:

> "So if a law be in opposition to the constitution; if both the law and the constitution apply to a particular case, so that the court must either decide that case conformably to the law, disregarding the constitution; or conformably to the constitution, disregarding the law; the court must determine which of these conflicting rules governs the case. . . ."

Nothing in the Fourteenth Amendment purports to give federal courts supervisory powers, in the affirmative sense of *McNabb* v. *United States,* 318 U. S. 332, over state courts. See *id.,* at 340–341. Moreover, where the constitutional power described by Marshall has been invoked, the Court has always been especially reluctant to interfere with state procedural practices. See *Spencer* v. *Texas,* 385 U. S. 554. From the beginning of the federal Union, state courts have had power to decide issues of federal law and to formulate "authoritative laws, rules, and remedies" for the trial of those issues. The primary responsibility for the trial of state criminal cases still rests

upon the States, and the only constitutional limitation upon these trials is that the laws, rules, and remedies applied must meet constitutional requirements. If they do not, this Court may hold them invalid. The Court has no power, however, to declare which of many admittedly constitutional alternatives a State may choose.[2] To impose uniform national requirements when alternatives are constitutionally permissible would destroy that opportunity for broad experimentation which is the genius of our federal system.

Even assuming that the Court has the power to fashion remedies and procedures binding on state courts for the protection of particular constitutional rights, I could not agree that a general harmless-error rule falls into that category. The harmless-error rules now utilized by all the States and in the federal judicial system are the product of judicial reform early in this century. Previously most American appellate courts, concerned about the harshness of criminal penalties, followed the rule imposed on English courts through the efforts of Baron Parke, and held that any error of substance required a reversal of conviction. See Orfield, Criminal Appeals in America 190. The reform movement, led by authorities like Roscoe Pound and Learned Hand, resulted in allowing courts to discon-

---

[2] Cases in which lower federal courts, acting under the authority of the Fourteenth Amendment, as expanded by this Court's decision in *Reynolds* v. *Sims,* 377 U. S. 533, have promulgated their own reapportionment plans may superficially be thought to support such a power: *E. g., Reynolds* v. *State Election Board,* 233 F. Supp. 323. But such cases are quite apart from the present one because they arise from a situation where some positive constitutional action is a necessity and thus require the exercise of special equity powers. Here the ordinary remedy of striking down unconstitutional harmless-error rules and applications is sufficient to deal with any problem that may arise. There is no necessity for a State to have a harmless-error rule at all.

tinue using reversal as a "necessary" remedy for particular errors and "to substitute judgment for the automatic application of rules . . . ." 4 Barron, Federal Practice and Procedure § 2571, at 438. This Court summarized the need for that development in the leading case of *Kotteakos* v. *United States,* 328 U. S. 750, 759:

> "§ 269 [a federal harmless error provision] and similar state legislation grew out of widespread and deep conviction over the general course of appellate review in American criminal causes. This was shortly, as one trial judge put it after § 269 had become law, that courts of review 'tower above the trials of criminal cases as impregnable citadels of technicality.' . . . [C]riminal trial became a game for sowing reversible error in the record."

Holding, as is done today, that a special harmless-error rule is a necessary remedy for a particular kind of error revives the unfortunate idea that appellate courts must act on particular errors rather than decide on reversal by an evaluation of the entire proceeding to determine whether the cause as a whole has been determined according to properly applicable law. In this case, California has recognized the impropriety of the trial comment here involved, and has given clear direction to state trial courts for the future. Certainly this is the appropriate remedy for the constitutional error committed. The challenged decision has no direct relation to federal constitutional provisions, rather it is an analysis of the question whether this admittedly improper comment had any significant impact on the outcome of the trial. In *Kotteakos, supra,* this Court described the "material factors" in harmless-error determinations as "the character of the proceeding, what is at stake upon its outcome, and the relation of the error asserted to casting the balance for decision on the case as a whole . . . ." *Id.,*

at 762. None of these factors has any relation to substantive constitutional provisions, and I think the Court errs in conceiving of an application of harmless-error rules as a remedy designed to safeguard particular constitutional rights.[3] It seems clear to me that harmless-error rules concern, instead, the fundamental integrity of the judicial proceedings as a whole.

As indicated above, I am of the opinion that the validity of a challenged state harmless-error rule itself is a federal constitutional question. Harmless-error rules may, as the Court says, "work very unfair and mischievous results." And just concern can be expressed over the possibility that state harmless-error decisions may result in the dilution of new constitutional doctrines because of state hostility to them. However, the record is barren of any showing that the California courts, which have been in the vanguard in the development of individual safeguards in criminal trials,[4] are using their harmless-error rule to destroy or dilute constitutional guarantees. If the contrary were the case and the harmless-error rule itself were shown to have resulted in a course of convictions significantly influenced by constitutionally impermissible factors, I think it clear that constitutional due process could not countenance the continued application

---

[3] The Court indeed recognizes, as does my Brother STEWART in his concurring opinion, that errors of constitutional dimension can be harmless, a proposition supported by ample precedent. See *Snyder* v. *Massachusetts,* 291 U. S. 97; *Motes* v. *United States,* 178 U. S. 458; *Haines* v. *United States,* 188 F. 2d 546; *United States* v. *Donnelly,* 179 F. 2d 227. Presumably all errors in the federal courts will continue to be evaluated under the single standard of 28 U. S. C. § 2111 as interpreted today. Certainly there is nothing in the substantive provisions of the Bill of Rights which suggests any standard for assessing the impact of their violation.

[4] See, *e. g., People* v. *Cahan,* 44 Cal. 2d 434, 282 P. 2d 905; *People* v. *Dorado,* 62 Cal. 2d 338, 398 P. 2d 361.

of the rule.[5]   And individual applications of a permissible rule would still be subject to scrutiny as to the tenability of the independent and adequate state ground.   See *Thompson* v. *Louisville,* 362 U. S. 199; *Terre Haute & Indianapolis Railroad Co.* v. *Indiana ex rel. Ketcham,* 194 U. S. 579; Note, The Untenable Nonfederal Ground in the Supreme Court, 74 Harv. L. Rev. 1375.

I thus see no need for this new constitutional doctrine.[6] Decision of this case should turn instead on the answers to two questions: Is the California harmless-error provision consistent with the guarantee of fundamental fairness embodied in the Due Process Clause of the Fourteenth Amendment?   See *Palko* v. *Connecticut, supra.* Was its application in this instance by the California Supreme Court a reasonable one or was the rule applied arbitrarily to evade the underlying constitutional mandate of fundamental fairness?   These issues will now be considered.

## II.

The California harmless-error rule is incorporated in that State's constitution.   It was first adopted by a vote of the people in 1911 and readopted as part of the revised constitution in 1966.   While its language allows reversal only where there has been a "miscarriage of justice," a long course of judicial decisions has shaped the rule in a manner which cannot be ignored.   California courts

---

[5] It is clear enough that this is not the rationale that the Court is employing.   The Court would leave California free to apply its harmless-error rule to errors of state law and must thus consider the rule itself consistent with constitutional due process.   This leaves the anomalous situation where the impact of a particular piece of evidence is to be assessed by a different "constitutional" standard depending only on whether state law or federal constitutional law barred its admittance.

[6] *Fahy* v. *Connecticut,* 375 U. S. 85, should not be deemed dispositive on such a far-reaching matter, which was entirely passed over in the Court's opinion in that case.

will not allow a conviction based upon an improperly obtained confession to stand. See, *e. g., People* v. *Dorado,* 62 Cal. 2d 338, 398 P. 2d 361; *People* v. *Sears,* 62 Cal. 2d 737, 401 P. 2d 938. Nor will the fact that sufficient evidence to support the conviction is present absent the tainted evidence preclude a reversal. See, *e. g., People* v. *Patubo,* 9 Cal. 2d 537, 71 P. 2d 270; *People* v. *Mahoney,* 201 Cal. 618, 258 P. 607. And reversal will be required when the tainted evidence is introduced in intentional violation of constitutional standards. See *People* v. *Sarazzawski,* 27 Cal. 2d 7, 161 P. 2d 934. Thus the California rule and the "federal rule" today declared applicable to state adjudication are parallel in these special instances [7] and their divergence, if any,

---

[7] Some special limitations on harmless error have always been respected by this Court and seem to me essential to the fundamental fairness guaranteed by the Due Process Clauses of the Fifth and Fourteenth Amendments. These limitations stem from what I perceive as two distinct considerations. The first is a recognition that particular types of error have an effect which is so devastating or inherently indeterminate that as a matter of law they cannot reasonably be found harmless. *E. g., Payne* v. *Arkansas,* 356 U. S. 560 (confessions); see *Fahy* v. *Connecticut, supra,* at 95 (dissenting opinion of HARLAN, J.); cf. *Bollenbach* v. *United States,* 326 U. S. 607 (independently sufficient evidence). The second is a recognition that certain types of official misbehavior require reversal simply because society cannot tolerate giving final effect to a judgment tainted with such intentional misconduct. *E. g., Berger* v. *United States,* 295 U. S. 78 (prosecutorial misconduct). Although they have never been viewed in this light, I would see violations of *Gideon* v. *Wainwright,* 372 U. S. 335, as falling in the first category, and violations of *Tumey* v. *Ohio,* 273 U. S. 510, as falling in the second. However, as I understand my Brother STEWART's opinion concurring in the result, he would read all such limitations into the content of the Due Process Clause and limit the application of harmless-error rules with respect to constitutional errors to an undefined category of instances. I think it preferable to resolve these special problems from an analysis of the nature of the error involved rather than by an attempt to discover limitations in

arises from the general formulation found in the opinions of the California Supreme Court.

In *People* v. *Watson,* 46 Cal. 2d 818, 299 P. 2d 243, the California Supreme Court undertook a general discussion of the application of the state harmless-error rule. It declared that the "final test" was "the 'opinion' of the reviewing court, in the sense of its belief or conviction, as to the effect of the error; and that ordinarily where the result appears just, and it further appears that such result would have been reached if the error had not been committed, a reversal will not be ordered." Reversal would be required only when "it is reasonably probable that a result more favorable to the appealing party would have been reached," and this judgment "must necessarily be based upon reasonable probabilities rather than upon mere possibilities; otherwise the entire purpose of the constitutional provision would be defeated." 46 Cal. 2d, at 835–837, 299 P. 2d, at 254–255. This formulation may sound somewhat different from that announced today, but on closer analysis the distinction between probability and possibility becomes essentially esoteric. In fact, California courts have at times equated the California standard with the standard utilized by this Court in *Fahy* v. *Connecticut, supra.* See, *e. g., People* v. *Jacobson,* 63 Cal. 2d 319, 331, 405 P. 2d 555, 563.

Similarly, members of this Court have used a variety of verbal formulae in deciding questions of harmless error in federal cases, ranging from today's "reasonable doubt" standard to the ability to "say with fair assurance . . . that the jury was not substantially swayed . . . ." *Fiswick* v. *United States,* 329 U. S. 211, 218. And the circuit courts have been equally varied in their expres-

the policy underlying the substantive constitutional provisions. The latter course seems to me to blur analysis and lead to distinction by fiat among equally specific constitutional guarantees.

sions. See *United States* v. *Brown*, 79 F. 2d 321; *United States* v. *Feinberg*, 140 F. 2d 592; *United States* v. *McMaster*, 343 F. 2d 176.

Against this background the California rule can hardly be said to be out of keeping with fundamental fairness, and I see no reason for striking it down on its face as a violation of the guarantee of "due process." [8]

## III.

A summary of the evidence introduced against the petitioners and the events of the trial will make it apparent that the application of the California rule in this case was not an unreasonable one. California courts have not hesitated to declare that comment has caused a miscarriage of justice when that conclusion has been warranted by the circumstances, see, *e. g.*, *People* v. *Keller*, 234 Cal. App. 2d 395, 44 Cal. Rptr. 432; *People* v. *Sigal*, 235 Cal. App. 2d 449, 45 Cal. Rptr. 481, but the posture of this case minimized the possible impact of the comment.

Petitioners were tried for the murder of a night club bartender in the course of a robbery of the club. The State established that petitioners were the last customers remaining in the club on the night of the murder. Three people with descriptions matching those of Chapman, Teale, and the victim were seen leaving the club together. The club had been ransacked and its condition indicated that the victim had been forced out of it. He was later shot from close range with a .22-caliber weapon and left beside a country road. It was shown that Chapman had purchased a similar weapon five days before the murder and this weapon was in Teale's possession when he was arrested. Blood matching the type of the victim was round on the floormat of the vehicle in which Chapman and Teale had been traveling. Other scientific testimony

---

[8] The rule was upheld by the Ninth Circuit in *Sampsell* v. *California*, 191 F. 2d 721, against an attack on its constitutionality.

established that the victim had been in petitioners' car. Blood (untypable) was found on Chapman's clothes, and blood matching the victim's was found on her shoes. Similar evidence connected Teale with the murder.

After his arrest Teale made admissions, amounting almost to a full confession, to a fellow prisoner and these were introduced against him. The jury was cautioned to disregard them as against Chapman. Petitioners pleaded not guilty, but offered no defense on the merits. The only defense witness was a Dr. Sheuerman who was called by Chapman in an effort to establish a defense of lack of capacity to form the requisite intent because of "disassociative reaction."

The prosecutor's comment on petitioners' failure to explain away or challenge the evidence presented against them was admittedly extensive.[9] The California Supreme Court found it harmless error for a number of reasons. First the court noted the convincing and unchallenged evidence presented by the State. It next observed that the jurors were certain to take notice of petitioners' silence whether or not there was comment since the evidence itself cried for an explanation. I think this point crucial, since it seems to me that this Court has confused the impact of petitioners' silence on the jury with the impact of the prosecution's comment upon that silence. The added impact of that comment would seem marginal in a case of this type where the jury must inevitably look to petitioners for an explanation of the innuendo of the real evidence and in Teale's case of his damaging admissions. Finally the California Supreme Court noted that Chapman, against whom the

---

[9] The decision in *Griffin* v. *California*, 380 U. S. 609, was not announced until after the trial of the case. Hence the trial was conducted according to what was, at the time, constitutional California law. No implication of prosecutorial misconduct can be drawn from these circumstances.

evidence was less strong, had keyed her defense to evidence of her mental defect, a subject upon which the comment had not touched. From this discriminating analysis it was concluded that another result was not "reasonably probable" absent the erroneous comments.

I cannot see how this resolution can be thought other than a reasonable, and therefore constitutional, application of the California harmless-error rule.

## IV.

When we consider how little is empirically known about the workings of a jury, see Kalven & Zeisel, The American Jury, *passim*, it seems to me highly inappropriate for this Court to presume to take upon itself the power to pass directly on the correctness of impact evaluations coming from 50 different jurisdictions. Juries must invariably react differently to particular items of evidence because of local predispositions and experience factors. The state courts, manned by local judges aware of and in touch with the special factors affecting local criminal trials, seem the best, and the constitutionally required, final authority for ruling on the effect of the admission of inadmissible evidence in state criminal proceedings, absent the application of a fundamentally unfair rule, or any unreasonable application of a proper rule manifesting a purpose to defeat federal constitutional rights. Once it appears that neither of these factors is present in a state harmless-constitutional-error decision, federal judicial responsibility should be at an end. This decision, however, encompasses much more. It imposes on this Court, in cases coming here directly from state courts, and on the lower federal courts, in cases arising on habeas corpus, the duty of determining for themselves whether a constitutional error was harmless. In all but insubstantial instances, this will entail a *de novo* assessment of the entire state trial record.

For one who believes that among the constitutional values which contribute to the preservation of our free society none ranks higher than the principles of federalism, and that this Court's responsibility for keeping such principles intact is no less than its responsibility for maintaining particular constitutional rights, the doctrine announced today is a most disturbing one. It cuts sharply into the finality of state criminal processes; it bids fair to place an unnecessary substantial burden of work on the federal courts; and it opens the door to further excursions by the federal judiciary into state judicial domains. I venture to hope that as time goes on this new doctrine, even in its present manifestation, will be found to have been strictly contained, still more that it will not be pushed to its logical extremes.

I respectfully dissent.