**Charles J. MUSIC, Appellant,**

v.

**STATE of Indiana, Appellee.**

No. 980S383.

Supreme Court of Indiana.

Nov. 13, 1981.

Howard S. Grimm, Jr., Fort Wayne, for appellant.

Theodore L. Sendak, Atty. Gen., Janis L. Summers, Deputy Atty. Gen., Indianapolis, for appellee.

DeBRULER, Justice.

Charles Music, the appellant, was charged by an information with murder, Ind.Code § 35–42–1–1, and was convicted by a jury of the included offense of voluntary manslaughter, a class B felony, Ind.Code § 35–42–1–3. He was sentenced to a term of twenty years in prison. His motion to correct error was denied and this appeal follows.

The issue on appeal is whether Music was denied a fair trial because a transcript of a tape-recorded interview between himself and his counsel conducted at the county jail after his arrest, was intercepted and copied by an employee of the sheriff's department.

In a hearing on his motion to correct error, Music sought to show that his attorney delivered an envelope to him at the Wabash County Jail where he was held following his arrest for the killing of his wife. The envelope contained a transcription of a tape-recorded interview between Music and his attorney. The recording was made by the attorney with Music's knowledge, and he had requested a copy of the transcription for his records. Music sought to show that at the direction of a captain of the Wabash County Sheriff's Office, a civilian employee of the county jail made a photocopy of the contents, and placed the photocopy in the file on Music's case which was eventually seen by the prosecutor in charge of the case.

The envelope and the transcription were introduced in evidence at the hearing. In the interview Music related that he was looking for his estranged wife on the day of the killing and, suspecting that she was at the home of another man, he went to his trailer, obtained a sawed-off shotgun, went to the home of the other man, and found his wife there. When counsel asked Music what happened then, he said, "All I know is the gun discharged."

Music sought to show by his testimony at the motion to correct error hearing that the State used information improperly obtained from the interview to build its case. He argues on appeal that absent the information contained in the transcription he might have been found either not guilty, or guilty of a less serious lesser included offense than voluntary manslaughter. The appellant's brief cites *Procunier v. Martinez*, (1974) 416 U.S. 396, 94 S.Ct. 1800, 40 L.Ed.2d 224, and cases interpreting it, for the general, and unquestioned, proposition that mail coming to prisoners from courts or attorneys may be opened by prison authorities only in the presence of the prisoners, and only for the purpose of intercepting contraband, and

that the contents may not be censored except to the extent they contain escape plans or other information concerning proposed criminal activity, or encoded messages.

Music argues that he should be granted a new trial, even in the absence of a showing of prejudice flowing from the interception of the transcript, because the interception itself amounted to the denial of effective assistance of counsel, citing *Coplon v. United States*, (D.C.Cir.1951) 191 F.2d 749, *cert. den.* 342 U.S. 926, 72 S.Ct. 363, 96 L.Ed. 690.

In *Coplon*, the United States Court of Appeals, District of Columbia Circuit, held, *inter alia*, that the trial court should have afforded the appellant a hearing on her allegations that the government listened through a wiretapping device to her telephone conversations with her attorney before the trial and while it was going on. The case was remanded for a hearing to determine whether the alleged interceptions actually occurred. If they had, the district court was to "award a new trial at which the accused can be free of surreptitious interceptions of her telephone conversations with her counsel, and can enjoy the right of his effective assistance which is guaranteed by the Constitution." *Id.* at 760. At the same time, however, the Court of Appeals concluded that none of the evidence could have been the result of intercepted telephone conversations, and held that the district court did not err in denying the motion for a new trial insofar as it was based on the theory that the government's proof was obtained by, or arose from leads obtained through, the wiretapping.

The conclusion reached in *Coplon* is not viable in light of the doctrine of harmless constitutional error, *Chapman v. United States*, (1967) 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705.

The Supreme Court held in *Chapman* that not all trial errors that violate the Constitution automatically call for reversal, but "before a federal constitutional error can be held harmless, the court must be able to declare its belief that it was harmless beyond a reasonable doubt." *Id.* at 828. See *Greer v. State*, (1969) 252 Ind. 20, 245 N.E.2d 158.

Here, we are not faced with a claimed trial error such as the admission into evidence of a defendant's statement obtained in violation of his federal constitutional rights, but rather a claim that the entire criminal proceeding was tainted by the use of information obtained improperly.

In *Chapman* the Supreme Court adopted the following formulation from *Fahy v. Connecticut*, (1963) 375 U.S. 85, 84 S.Ct. 229, 11 L.Ed.2d 171, of the question to be asked in reviewing claims of this kind: "Whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction." *Chapman v. United States, supra*, 87 S.Ct. at 827.

After reviewing the evidence presented at the hearing on the motion to correct error, we find that the trial court could well have concluded that Music failed to show that any evidence in the trial was the fruit of the illegal interception. The evidence did establish that the envelope was intercepted and the contents copied. There was, however, sharply conflicting evidence about what became of the copy and who, if anyone, authorized the copying. Music asserted that prosecution witnesses must have read the transcription because it contained a transcriber's mistake—a statement at variance with the statement he said he actually made during the interview. He attempted to show that Sheriff Tomson, in testifying about a statement Tomson said Music made voluntarily, gave a version of the facts containing the transcriber's variance, thus revealing his acquaintance with the transcript. Our examination of the transcript reveals that in the interview with his attorney, Music said that he saw his wife in a tavern "with the owner, Bill Nordman, and one other guy." Sheriff Tomson testified at trial that Music gave him an oral statement after being advised of his right to remain silent and to have a lawyer. Asked about what Music told him, Tomson testified, "Well, [Music] stated that he was at the East End Tavern in North Manchester and his wife came in, she completely ignored him, she went to a table I believe it was talking to some other ladies....."

There was testimony at the hearing by Officer Brainard, who had investigated the killing, that he had read the transcript. He said that he was unaware that it was a lawyer-client interview because it only showed the names "Jerry" and "Music" in the margin. He testified that he initially assumed the "Jerry" was Jerry Hults, a state trooper who often interviewed prisoners held at the jail, and that he was reading the trooper's notes on his interview. Brainard further testified that he did not rely on information in the transcript when he testified at the trial, and indeed the transcript of the trial reveals that Brainard testified only about his investigation at the scene of the killing, and not about Music's statements after his arrest. He further testified at the hearing on the motion to correct error that he discussed the contents of the interview with no one. The captain testified that he ordered no one to make a copy of the transcription.

Sheriff Tomson testified that when he learned of the existence of the transcript, he retrieved it from the file and burned it. The prosecutor testified that no one discussed the transcript with him, that he did not know of its existence until the day of the sentencing hearing, and that he never saw it.

Alternatively, the trial court may properly have concluded that even if the transcript had been used by the prosecutor, the violation of Music's constitutional rights was harmless beyond a reasonable doubt because the information obtained in no way contributed to the jury's verdict. *Chapman v. United States, supra.* This conclusion is supportable in light of the failure of the defendant to show how he was prejudiced, and the evidence marshalled by the State against Music. This included the testimony of an eyewitness, Bill Nordman, who said that he saw Music shoot his wife with a sawed-off shotgun. The potentially useful information in the interview was the same as eyewitness' testimony, and the discrepancy, if any, as to whether the victim sat with women or men at the tavern before the killing was not material.

The conviction is affirmed.

GIVAN, C. J., and HUNTER, PRENTICE and PIVARNIK, JJ., concur.