**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Juan Manuel JIMINEZ–LOPEZ,**
**Defendant-Appellant.**

**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Pedro JIMINEZ–LOPEZ, Defendant-**
**Appellant.**

**No. 26149.**

United States Court of Appeals,
Ninth Circuit.

Jan. 28, 1971.

Rehearing Denied Feb. 23, 1971.

Jo Ann D. Diamons (argued), Tucson, Ariz., for appellants.

Ann Bowen (argued), Asst. U. S. Atty., Richard K. Burke, U. S. Atty., Tucson, Ariz., for appellee.

Before MADDEN,* Judge of the United States Court of Claims, MERRILL and HUFSTEDLER, Circuit Judges.

### J. WARREN MADDEN, Judge:

A federal grand jury at Tucson, Arizona, returned an indictment against the appellants. Count I charged them with a violation of 21 U.S.C. § 176a by having knowingly and with intent to defraud the United States, received, concealed and facilitated the transportation and concealment of approximately 850 pounds of marijuana, at approximately 25 miles north of Sasabe, Arizona, after the marijuana had been imported into the United States contrary to law, i. e. without the marijuana having been declared and presented for inspection to a United States Customs Officer at the port of entry as required by 19 U.S.C. § 1461. Count II charged appellant Juan Manuel Jiminez-Lopez, hereinafter Juan Manuel, with violation of 8 U.S.C. § 1325 in that he was an alien and had entered the United States from Mexico at a time and place other than as designated by U.S. Immigration Officers, i. e. near Sasabe, Arizona, and after such entry did elude examination and inspection by U.S. Immigration Officers until he was apprehended in Arizona. In Count III of the indictment, the appellant Pedro Jiminez-Lopez hereinafter Pedro, was charged with a violation of 8 U.S.C. § 1325, similar to the charge recited above, against Juan Manuel.

Juan Manuel pleaded guilty to Count II and Pedro pleaded guilty to Count III of the indictment. Each was sentenced to six months imprisonment on his plea of guilty.

On May 20, 1970, the appellants were tried in a jury trial on Count I of the indictment. The jury returned a verdict of guilty as to each appellant. The court entered judgments on the verdicts and sentenced each appellant to seven years imprisonment, the sentences to run concurrently with the six month sentences previously imposed. They were granted leave to appeal in forma pauperis and did so. The issues presented on the appeal as stated by the appellants, are:

1. Did the court, by allowing Government counsel to ask why the wrappers were not sent for fingerprint examination and had heard what the answer was going to be, commit prejudicial error?

2. Was the evidence of Pedro's guilt sufficient to allow the case to go to the jury?

3. Did Government's counsel commit plain error by asking a question, the voluntariness of which had not been established and then not pursue the matter?

The issues as recited above will become more understandable as the discussion develops.

Juan Manuel testified at the trial that he is a citizen of Mexico, and lived at

---

* J. Warren Madden, Senior Judge of the United States Court of Claims, sitting by designation.

Altar, Sonora, in that country; that he owned his own truck; that while in Santa Ana on the afternoon of March 17, 1970, on business, he met Juan Manuel Medina whose business was "taking things from here to there". Medina told Juan Manuel that he wanted Juan Manuel to drive a truck for him "through the fence" for 5,000 pesos which is $400.00 American money. Medina told him he would be carrying contraband but did not tell him what it was. Juan Manuel agreed to do what Medina requested because it appeared to him to be easy and he needed the money. Arrangements were made to meet at six o'clock. Juan Manuel was not to use his own truck; Medina was to load the truck which Juan Manuel was to drive to Tucson. They met at six o'clock. Medina told Juan Manuel that he, Medina, would meet him, or get someone to meet him, at a market, by giving a signal on Ajo Way, at the approach to Tucson; that whoever would meet Juan Manuel there would get him back to Mexico.

When Juan Manuel took charge of the loaded truck, he drove to Altar, where he lived. He saw hay in the back of the truck but he did not open the truck. He stopped in Altar and asked his brother Pedro (the co-appellant herein) to go with him to Tucson, "so that if something happened on the way he wouldn't be by himself." He told Pedro nothing more than that they were going to Tucson. They left Altar between nine and ten in the evening. Juan Manuel drove all the way. When they reached the border Pedro lowered the wires of the border fence, the truck was driven across the border, Pedro put the wires back in place and the journey toward Tucson was resumed. They were stopped at about 2:00 A.M., about 30 miles from Sasabe and were asked for their passports. After some conversation they were asked to get into the official patrol car. They did so and were taken to a Customs Station, to which the truck was also taken.

Testimony given by customs officials was to the effect that the truck driven by Juan Manuel contained some 850 pounds of marijuana, packaged in small packages of the shape and size typical for the handling of marijuana, the packages being concealed by being covered by several bales of hay and a considerable quantity of loose hay. A Government witness with some expertise in the subject, placed a value of $70,000.00 to $90,000.00 on the marijuana in the load.

There is no issue in this appeal regarding the sufficiency of the evidence to support the conviction of Juan Manuel. We will now repeat and discuss the first issue raised by the appellants. It is:

Did the court, by allowing Government counsel to ask why the wrappers were not sent for fingerprint examination and had heard what the answer was going to be, commit prejudicial error?

The customs officials had questioned the appellants after a Miranda type warning which warning the trial judge had held, in a suppression hearing before the trial, to be, in the circumstances, inadequate. The answers were therefore suppressed. In the cross-examination by appellants' counsel of a government witness, Cavitt, the witness was asked whether he had sent a certain one of the packages containing marijuana to the government's fingerprint experts for examination. The question was relevant to the issue of whether Juan Manuel or Pedro or both were aware that there was marijuana in the truck. This was, and still is, with regard to Pedro, a debatable issue in the case but it could have been eliminated as an issue if Pedro's fingerprints had been found on the package of marijuana. Cavitt's answer to the question was "I did not". On redirect examination of Cavitt by government counsel, counsel, outside the hearing of the jury, obtained the consent of the court to ask Cavitt why he had not submitted the package for examination for fingerprints, and to receive his answer which would be "I did not submit them (sic) because of statements from the defendant". Counsel for the appel-

lants objected to the proposed question and answer; the objection was overruled; the question was asked; the answer was "Because of a statement made by Juan Manuel". That was the end of the dialogue. Counsel and the court correctly assumed that the "statement" referred to by the witness Cavitt was something that Juan Manuel had said in answer to questions asked him during the interrogation which took place after the inadequate Miranda warning referred to above.

In this appeal the appellants' first issue, as we have seen, is that the admission of the reference of the witness to a statement which had been suppressed in the pre-trial hearing was erroneous and prejudicial. The government urges that, in the circumstances, the question and answer were proper. It says that the appellants brought the incident out by asking the witness Cavitt, on cross-examination, whether he had had the package examined for fingerprints. The government says that that question was asked for the purpose of discrediting the witness by showing that he had, apparently, made a less than thorough investigation of the case which the government was about to bring against the appellants. We think it is obvious that appellants' counsel asked the question to bring out the fact that the appellants' fingerprints were not found, nor even looked for, on the package, and to suggest the inference that they weren't even looked for because it was feared that none would be found if they were looked for. We have already adverted to the importance which fingerprint evidence would have had if such evidence had been found. The government says that its question on re-direct was proper, quoting the following language from 98 C.J.S. Witnesses § 421.

In general, a witness may testify on redirect examination as to his reasons for his statements on cross-examination, or for his prior statements, acts, omissions to act, or other conduct brought out on cross-examination.

The C.J.S. quotation has nothing to do with a situation in which the question asked on re-direct examination will produce an answer containing information which, in a pre-trial order, has been suppressed because it was obtained by extra-judicial questioning which violated the Miranda rule.

■ The government also makes the remarkable argument that because the appellants' opening statement showed that their counsel already knew that there had been no examination of the package for fingerprints, and that therefore the only reason for asking the question on cross-examination was to discredit the witness, not to elicit information, since counsel already had the information. Many practitioners follow a rule that only rarely should counsel ask a question on cross-examination *unless* he knows what the answer will be. The reason for counsel's asking the question about fingerprints was so that the *jury* might know the answer.

The Government urges that the pretrial order of suppression had been erroneously made because the Miranda warning had, in fact been given. The statement of the trial judge who was sitting at the suppression hearing, does indicate that he took a rather expansive view of the Miranda rights, as applied to the circumstances of these appellants. We think that that view was within the permissible judicial discretion of the judge who expressed it. But his suppression ruling was the law of the case, since it was not modified by the trial judge who sat at the trial, and we think it was error for the latter judge to permit the question and the answer given on re-direct examination which disclosed that there had been extra-judicial questioning and that some sort of an answer had been given. An acute jury might have surmised that the answer persuaded Cavitt, the Customs Official, that it would be unnecessary to seek any further evidence to connect the appellants with the load of marijuana.

We think, however, that the error described above was harmless, beyond any

reasonable doubt. Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed. 2d 705 (1967). Juan Manuel had been arrested, a search to which no exception was or is taken discovered 850 pounds of marijuana concealed in the truck which he had charge of when arrested, he testified at the trial that he knew that the truck contained contraband when he caused it to be driven "through the fence". These items constitute overwhelming evidence of his guilt of the crime of which he has been convicted. To require a new trial free of the error which we have described above would be a reckless waste of judicial resources, assets which are in short supply. It may be noted that in this instant appeal there is no contention that the verdict against Juan Manuel is not supported by the evidence, a contention that is usually made if the issue is even remotely arguable.

■ The second issue presented by the appellants is "was the evidence of Pedro's guilt sufficient to allow the case to go to the jury".

We have recited what the record shows as to how Pedro became involved in the drive from the appellant's home town in Mexico, "through the fence" into the United States. Juan Manuel testified that he told Pedro only that they were going to drive, at night, through the fence, to Tucson, Arizona. It is believable that that is all that Pedro was told, because on furtive expeditions of this kind, the fewer persons that know details, the better. The visible part of the load was hay, some loose and some baled. Pedro must have known that there was contraband under the hay, because it would have made no sense to carry hay furtively through the border fence. If there was contraband it could not have been Mexicans being smuggled into the United States under the hay, because the journey from the starting point in Mexico to the border took several hours, and Pedro would have become aware of the presence of these passengers. So when they reached the border and Pedro took down the fence, he did not believe that they were transporting hay or smuggling aliens. He did not believe that they were smuggling heroin or other small volume, high value, narcotics, because that method of smuggling such commodities would not have been normal or sensible. He would have known that a practical way to smuggle a large quantity of marijuana, in containers, would be to conceal it under the hay. Thus there was circumstantial evidence tending to show that when Pedro took down the fence for the truck he knew that he was assisting in the smuggling of marijuana.

There was evidence that at the Customs Station where the truck was searched, one white package of marijuana with one end open exposing marijuana was visible on top of the hay. There was testimony that the white package was on Pedro's side of the load. There was evidence that a tall man standing on the ground could look over the tail gate or the side-boards of the truck and see some of the packages that had hay on top of them. The jury could form a judgment as to whether Pedro was tall enough to do that.

The rule properly applicable to Pedro's case is that an appellate court, when a verdict of guilty in a criminal case is attacked as not being supported by the evidence, "must take the view of the evidence most favorable to the government". Riley v. United States, 411 F.2d 1146, 1150, CA 9, 1969. We therefore conclude that the appellants' second issue on appeal must be resolved against them. The third issue presented by the appellants in this appeal is:

Government's counsel committed plain error by asking a question, the voluntariness of which had not been established, and then did not proceed with it.

We do not approve the grammar of the foregoing statement, but we will discuss the issue. In her opening statement, government counsel said that Government Agent Thompson, in questioning the passenger in the truck, at the

time the truck was first stopped by the officer, was told that he was Pedro, and was a cousin of Juan Manuel, the driver. At the trial, government counsel, in direct examination of Thompson, asked him whether he had determined that there was a relationship between Juan Manuel and Pedro. Thompson's answer was that he had, in connection with the arrest of the two men. The unfinished answer was "I questioned * * *." At that point the appellants' counsel asked if she could approach the bench "on that". She did so and reminded the court that the other judge who had sat at the suppression hearing had excluded, on Miranda grounds, statements made by the appellants. There followed some discussion between court and counsel, still out of the presence of the jury, but Thompson never completed his answer. When the defense put in its case, government counsel, in cross-examining Pedro, asked him "at the time that the officer (sic) stopped you on the highway did they ask you, did you tell anything about your relationship to the other defendant, that he was your brother?" A. "No." Q. "Later, after you were brought back here to Tucson, were you asked about your relationship with the defendant?" A. "Yes". Government counsel apparently hoped to continue the questioning and elicit from Pedro that he had said, after the arrest, that he was Juan Manuel's cousin. He had testified in the trial that he was Juan Manuel's brother. If he had answered government counsel's question on cross-examination by admitting that he had said, in his extra-judicial statement after arrest, that he was Juan Manuel's cousin, that would have constituted a prior contradictory statement inconsistent with his sworn testimony and could have been used, at least, to impeach him as a witness, and possibly as substantive evidence that his extra-judicial statement was the truth. California v. Green, 399 U.S. 149, 90 S. Ct. 1930, 26 L.Ed.2d 489 (1970). The more probable purpose was to bring out that Pedro was lying about his relation-

ship to Juan Manuel and therefore might have been lying about how little he knew about what was in the truck. But appellant's counsel objected to the question on the ground that the suppression order made evidence of extra-judicial statements of Pedro inadmissible. At this point government counsel, wisely, we think, withdrew the question in the interest of saving time.

 By her objection, counsel for the appellants succeeded in preventing government counsel from accomplishing her objective of proving a prior contradictory statement by Pedro, and thus impeaching his credibility. We cannot see how the appellants could have suffered prejudice therefrom. Our conclusion is that appellants' third assignment of error has no merit.

The judgment is affirmed, as against both appellants.