UNITED STATES of America,
Plaintiff-Appellee,

v.

Israel MATOS, Defendant-Appellant.

No. 17909.

United States Court of Appeals,
Seventh Circuit.

March 29, 1971.

Pell, Circuit Judge, concurred and filed an opinion.

Stevens, Circuit Judge, dissented and filed opinion.

Ronald P. Alwin, Chicago, Ill., for defendant-appellant.

William J. Bauer, U. S. Atty., Chicago, Ill., for plaintiff-appellee; John Peter Lulinski, Jeffrey Cole, Steven J. Kadison, Asst. U. S. Attys., of counsel.

Before KILEY, PELL and STEVENS, Circuit Judges.

KILEY, Circuit Judge.

A jury found defendant Matos, a postal employee, guilty, under two separate counts of the indictment, of two thefts from the mail in violation of 18 U.S.C. § 1709. Matos has appealed from the judgment on the verdict and concurrent sentences of five years on each count. We reverse and remand for a new trial.

Matos had been a postal employee for more than two years when he was arrested for theft of two watches from packages in the mail. He was at the time working as a dockman engaged in loading sacks of Hawaii-bound mail into

trailers from a conveyor which brought the sacks to the trailer from a chute leading from the post office. There is evidence that on the two occasions subject of the indictment three postal inspectors, from a hidden place above the dock, observed Matos. It is substantially undisputed that on both days they saw Matos pick up a "test marked" package containing a watch, which package had fallen from the specially identifiable mail bags that had been left partially open by the inspectors. Matos, on both occasions, then placed the package inside the trailer and went behind a mound of bags, apparently out of the view of the inspectors. The inspectors did notice movement at the top of the load. The watch placed in the test package on the first occasion was missing from the sack when the trailer arrived in Honolulu.[1] The watch on the second occasion was turned over by Matos to the inspector after they apprehended him.

## I.

The only issue on appeal is whether a new trial should be ordered because Matos' Fifth Amendment right to remain silent was violated by admission into evidence of an unresponsive statement by a postal inspector to a question by the government attorney.

Inspector Mesics, testifying in the government's case in chief, began to tell what happened in Inspector Bottker's office in the post office building, to which Matos was brought after being apprehended. Matos' attorney, anticipating "troubled waters," moved for a voir dire hearing. At the hearing testimony developed that Matos, having been given the *Miranda* warnings, requested a lawyer and refused to sign a waiver. Matos' attorney's anticipatory objection and motion for mistrial were overruled. And the government attorney promised to avoid "trouble waters" at resumption of trial.

After the *voir dire* was concluded, Mesics testified, in the presence of the jury, about the giving of *Miranda* warnings by Bottker, and that Matos, on request, emptied his pockets and uncovered the watch taken on the second occasion. Inspector Bottker then corroborated Mesics' testimony. He told Matos he was under arrest, read the warnings to him, and offered him for signature a waiver of rights form. The government attorney then asked, "Now, after this, did you tell defendant anything?" Bottker answered that Matos "indicated he did not desire to make a statement." Matos' attorney objected and moved for a mistrial. The district court overruled the objection and denied the motion, and then denied a motion to caution the jury to disregard the unresponsive part of Bottker's answer.

■ The violation of Matos' Fifth Amendment right to silence is plain. Miranda v. Arizona, 384 U.S. 436, 468, n. 37, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1964);[2] United States v. Nielsen, 392 F.2d 849, 853 (7th Cir. 1968). It was constitutional error to admit the testimony that Matos desired not to make a statement. We hold that Matos' Fifth Amendment right not to incriminate himself was violated by the admission into evidence of the postal inspector's comment, and the error was compounded by the trial court's refusal to instruct

---

1. The verdict of guilty was to Counts I and II. The arguments in briefs are confined to Count II, in the proof of which the alleged constitutional error occurred. The sentences were concurrent, but the government does not seek to sustain Matos' conviction on Count I. Since the judgment is to be reversed on Count II, Matos should have a new trial as to both counts.

2. "In accord with our decision today, it is impermissible to penalize an individual for exercising his Fifth Amendment privilege when he is under police custodial interrogation. The prosecution may not, therefore, use at trial the fact that he stood mute or claimed his privilege in the face of accusation." 384 U.S. at 468, n. 37, 86 S.Ct. at 1625.

the jury that the Bottker statement should not be considered as evidence.

## II.

■■ The government argues that if what occurred is error it was harmless, citing Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). Under *Chapman* the government has the burden of demonstrating to us beyond a reasonable doubt that the constitutional error did not contribute to Matos' conviction; that "before a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt." Id. at 24, 87 S.Ct. at 828. The government relies, for meeting its burden, upon the "conclusiveness" of the evidence against Matos so as to invoke the rule in Harrington v. California, 395 U.S. 250, 89 S.Ct. 1726, 23 L.Ed.2d 284 (1969), and this court's decisions in United States v. Allsenberrie, 424 F.2d 1209 (7th Cir. 1970); United States v. Wick, 416 F.2d 61, 62 (7th Cir.) cert. denied 396 U.S. 961, 90 S.Ct. 430, 24 L.Ed.2d 425 (1969); United States v. Sutt, 415 F.2d 1305, 1308 (7th Cir. 1969); and United States v. Franke, 409 F.2d 958 (7th Cir. 1969). The application of the harmless error rule is peculiarly dependent on the facts of each case.

Matos' defense was that he had no intention of stealing the watch. He testified that while working he accidentally stepped on a box which contained the watch, and that he picked the watch up and put it in his pocket with the intention of returning it to the platform office. He further testified that after he had picked up the watch the supervisor told him to go to lunch and that he was apprehended at the second floor time clock after "punching out" for lunch. He was then brought to the inspector's office where he was arrested and confronted by the three inspectors.

Matos stated that he did not take the watch to the supervisor because the supervisor left right after telling him to go to lunch and because he had been instructed to take lost articles which he found to the platform office in person, not to give them to the supervisor. He testified that he was arrested before he had a chance to go to the platform office.

The record is not clear whether Matos could or could not understand English. There was evidence that he filled out his job application in English. Yet at the conference inspectors called a Spanish interpreter to aid their discussion with him. Two character witnesses testified to Matos' good reputation for truthfulness, honesty and integrity.

■ The vital question for the jury was Matos' credibility in his testimony that he did not intend to steal the watch. Although there was sufficient evidence for a jury to discredit Matos' explanation of his actions, we cannot, under the circumstances mentioned above, declare a belief that, absent the Bottker unresponsive answer—highlighted by Matos' counsel's forced objection and motions for mistrial and cautionary instruction in front of the jury—no juror could have entertained a reasonable doubt that Matos, had he not been intercepted at the time clock, would have turned in the watch after lunch.

The government's reliance on *Allsenberrie, Wick, Sutt,* and *Franke* is misplaced. In *Allsenberrie,* defendant admitted to government agents knowledge of cartons stolen in commerce but refused to tell where they were, relying on his Fifth Amendment right to remain silent. The court ruled that the comment on the silence was harmless since 'there was no dispute that defendant was the "dockman" who handled the shipment of the cartons which were located in a valid search, and defendant effectually admitted that he knew of the whereabouts of the missing cartons. In *Wick,* an agent testified that he heard another agent ask defendant, after *Miranda* warnings, whether he obtained counterfeit notes, and that defendant re-

fused to answer. This conversation was "briefly mentioned" in argument to the jury. This court held these incidents, "amidst the overwhelming evidence" against Wick, including two positive identifications, could not have contributed to the jury verdict. In *Sutt,* the district court admitted three in-custody statements against Sutt. In two of these Sutt was not given *Miranda* warnings, and in the third he was warned. The three statements he gave FBI agents were exculpatory, but the third statement, which was made after the *Miranda* warnings were given, was more detailed and incriminating. The court held the defendant was not prejudiced by the introduction of the first two statements. Also, the statements in that case were not so directly on a precisely vital question of intention as the unresponsive answer of Bottker here. There was a strong web of circumstantial evidence against Sutt. We affirmed on that record. *Franke* did not involve a *Miranda* question. The question there was whether incriminating information established probable cause for Franke's arrest. The government introduced into evidence, for the purpose of corroborating the informer's tip, testimony of federal agents regarding what they heard through electronic eavesdropping. We assumed, but did not decide, there was constitutional error in the admission of the fruits of eavesdropping, but sustained the arrest because the "information" given by the "informer" without regard to the eavesdropping evidence was sufficient to establish probable cause, and there was no evidence to refute the incriminating testimony of the informer at the trial.

In aid of a new trial for Matos we point out that the *Miranda* warning testimony was unnecessary proof in the case. There was no introduction into evidence of a confession or incriminating statement that required proof of the warning. The proof of Matos' employment, what the inspectors saw him do, the uncovering of the watch and identifying it as having been the one test mailed, were the elements of the offense charged. 18 U.S.C. § 1709. *See* Byram v. United States, 25 App. D.C. 546 (1905). Adducing unnecessary *Miranda* testimony opens the door to possible prejudice of a defendant. Moreover, when the door is opened, risks arise that what happened here may happen. It seems to us that the inspector who volunteered the prejudicial statement knew of the *Miranda* decision, since he had given Matos the warning. We presume that he knew that a prime purpose of the Supreme Court in *Miranda* is to "guarantee full effectuation of the privilege against self-incrimination." Johnson v. New Jersey, 384 U.S. 719, 729, 86 S.Ct. 1772, 1779, 16 L.Ed.2d 882 (1966). He should have known that his volunteered statement ran counter to that purpose.

Reversed and Remanded for New Trial.

PELL, Circuit Judge (concurring).

While I fully subscribe to the well reasoned decision of Judge Kiley, because of the dissenting opinion filed thereto, I feel constrained to add these words of concurrence.

Trial lawyers devote countless hours to the subject of factors influencing jury verdicts. Some of this time is in the nature of observation based on experience, some educated guesses and some, of course, pure speculation.

We at the appeal level should not speculate as to what a particular jury, or juror, might have done under other circumstances. Neither on the other hand, however, should we speculate that some trial procedure with a highly prejudicial potential might not have realized its potential. One form of speculation is as undesirable as the other.

I require no unrealistic flight of the imagination to conceive jury discussion to the effect that if Matos really thought that he should take the watch to the platform office, without telling anyone en route, he certainly would have explained the whole situation when confronted by the postal inspectors.

It would take only one juror to say persuasively to the other members of the panel, "But who can believe he was innocent when he refused to make a statement when he had a chance? I don't believe any of his testimony. It's all something he, or somebody, thought up for this trial."

It is sufficient in my opinion that a factual situation existed which made possible such a statement, whether in fact it was or was not made.

Harmless error should never be predicated upon speculation.

STEVENS, Circuit Judge, (dissenting).

If the record indicated that the postal inspector had deliberately volunteered a comment on the defendant's assertion of his Fifth Amendment privilege, a mistrial should have been granted. Even if the comment was not deliberate, this court's decision may be justified as a safeguard against such improper behavior by government agents who must appear frequently as prosecution witnesses. As I interpret the record, however, the mistake was a relatively unimportant inadvertence; its significance was magnified by the manner in which defense counsel objected, but I would not charge the prosecution with the consequences of a defense objection.

This case does not involve any police misconduct. The postal inspector advised Matos of his right to counsel before asking him to empty his pockets.

The deterrent purpose underlying the decision in Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694, is, therefore, inapplicable. Nor is this a case in which the jury was asked to draw an inference of guilt from the defendant's assertion of his privilege against self-incrimination. *Cf.* Griffin v. California, 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106. The government did not even claim that defendant's silence at the time of his arrest impeached his testimony at the trial. *Cf.* Fowle v. United States, 410 F.2d 48 (9th Cir. 1969); compare Harris v. New York, 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1. Thus, there was neither prosecutorial nor police misconduct.[1]

The testimony before the jury did not disclose that Matos had refused to sign a waiver of rights or that he had asked for a lawyer at the time of his arrest.[2] Nor was there any testimony that he asserted his constitutional privilege against self-incrimination. There was, however, repeated testimony that the defendant remained silent at times when he would have spoken if, as he testified, he had intended to give the watch to the proper authorities as soon as feasible. The most significant testimony was received without objection.

Thus, on cross-examination, defendant acknowledged that after he "found" the watch and before he was arrested, he did not show it to another employee who was with him[3] or to his supervisor when he told him to go to lunch.[4] Moreover, In-

---

1. Unless, of course, one infers that the "inadvertence" was contrived between prosecutor and witness; I am satisfied that such an inference is not warranted by the record.

2. These facts were brought out during the *voir dire* hearing to consider defendant's objection that the request to empty his pockets violated his constitutional rights because his arrest was without a warrant.

3. "Q About 11:00 o'clock. Was there anyone around? You testified there were other employees. Were they around at the time you found the watch?
"A (In English) Yes, one guy.
"Q One man?
"A (In English) Yes.
"Q Did you show him the watch?
"A (In English) No."

4. "Q After you found the watch, that was about 11:00 o'clock, is that right?
"A (In English) Yes.
"Q What time did you go to lunch?
"A (In English) 11:00.

spector Mott testified, without objection, that when he accosted the defendant, identified himself, and told him that he wanted to ask him some questions, the defendant did not say anything.[5] Mott then testified that he brought the defendant to Bottker's office where the defendant was asked to empty his pockets.[6]

Before Bottker testified, Inspector Mesics confirmed Mott's testimony which

disclosed that the defendant had been placed under arrest, that upon request he had voluntarily emptied his pockets, and that the watch had been found wrapped in a dirty white cloth.[7] No reference was made in either Mott's or Mesics' testimony, on either direct or cross-examination, to any comment by the defendant.

Thus, apart from Bottker's testimony, the uncontradicted evidence established

"Q  11:00 o'clock.
Who told you to go to lunch?
"A  (In English) Supervisor.
"Q  Do you know his name?
"A  (In English) Yes.
"Q  What is his name?
"A  (In English) Shack.
"Q  Shack?  Did you talk to your supervisor at that time?
"A  (In English) No.
          *          *          *          *          *
"Q  Did you tell your supervisor that you found a watch?
"A  (In English) No, sir.
          *          *          *          *          *
"Q  The watch was in your pocket, was it not, at this time?
"A  (In English) No.  When he told me to go to lunch, and I don't put it in my pocket.
"Q  Did you have the watch out in your hand all this time?
"A  (In English) When he told me to go to lunch?
"Q  Yes.
"A  (In English) Yes, in my hand with my glove.
"Q  All you had to do is open your hand like this (indicating) and say, 'I found this'.  You did not do that, did you?
"A  (In English) No, I don't do it."

5. "Did you have a conversation with him?
"A  Yes, I walked up to him and I told him I was from the Inspector's Office and that we would like to ask him some questions.
"Q  What did he say to you?
"A  He didn't say anything at that time.
"Q  Then what did you do?
"A  The defendant and I went down the stairwell again and when we got downstairs he asked me what this was all about, and I told him that this was an official investigation and that when we got

to the Inspector's Office we would have an interpreter there so that he would understand what was going on, and I asked him, 'Comprende', and he said yes.
"Q  You asked him, 'Comprende' in Spanish, right?
"A  Yes.
"Q  How did he respond?
"A  He said yes in English."

6. "Q  Now, did Agent Bottger [sic] have a conversation with the defendant?
"A  Yes.  He told the defendant he was under arrest and asked him to empty his pockets, if he would.
"Q  Now, just prior to this, were you in communication with Agent Bottger at the time that you were proceeding over to the office?
"A  We were in radio communication with him.
"Q  Now, after the defendant was told he was under arrest and to remove the contents of his pockets, what happened, if anything?
"MR. ALWIN:  Objection, your Honor.
"THE COURT:  Objection overruled.  You may have a standing objection.
"BY MR. SIAVELIS:
"Q  What happened, sir?
"A  The defendant started to take the articles out of his front pockets and then Mr. Mesics asked him to remove the items out of his rear pockets also, and the defendant removed a dirty wash cloth from his left rear pocket and put it on the table also.
"Q  Then what happened?
"A  Mr. Mesics told him to unwrap the wash cloth, or asked him to open it up —it was rolled up—and inside the wash cloth was a watch."

7. "Q  You are in the office now, Agent Mesics.  Did Agent Bottger have a conversation with the defendant?
"A  When I came into the office Bottger was in the process of telling the—

that the defendant had had three opportunities to return the watch before it was found wrapped in a soiled cloth in his pocket, and that on each occasion he had remained silent. The comment by Bottker, which is the basis for reversal, was in the nature of cumulative evidence with respect to the third occasion on which defendant remained silent. In my judgment, it was not sufficiently different from the other two occasions, to warrant reversal.

.In expressing this opinion I do not purport to declare a belief that no juror could have entertained a reasonable doubt as to defendant's guilt if the comment had not been made.[8] I merely conclude that the error here is less significant than the error in Harrington v. California, 395 U.S. 250, 89 S.Ct. 1726, 23 L.Ed.2d 284; Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705, or Fahy v. Connecticut, 375 U.S. 85, 84 S.Ct. 229, 11 L.Ed.2d 171; that the evidence of guilt, apart from the error, is as strong, if not stronger (and conversely the basis for a reasonable doubt as to defendant's guilt is as weak, or weaker) than in any of those cases. Regardless of the proper verbalization of the rule, I am, therefore, persuaded that Bottker's comment was "harmless" within the holdings of those cases.

"Q Excuse me. Did he place the defendant under arrest?

"A He was telling him he was under arrest, yes, sir.

"Q Did he also say anything else?

"A He asked him to empty his pockets.

"Q What happened then?

"MR. ALWIN: I object, your Honor. May I have a continuing objection?

"THE COURT: You may have a continuing objection. Objection overruled.

"BY MR. SIAVELIS:

"Q What happened?

"A The defendant emptied his front pockets first, removed some coins and some other articles, and from his back pockets he removed—the one pocket, I believe it was the left rear pocket, he removed what looked like a wash cloth, it was dirty, white, and he set this on the table.

"Q Then what happened?

"A Then this wash cloth—the watch was found wrapped up."

8. Such a declaration is inappropriate.

"It is argued that we must reverse if we can imagine a single juror whose mind might have been made up because of Cooper's and Bosby's confessions and who otherwise would have remained in doubt and unconvinced. We of course do not know the jurors who sat. Our judgment must be based on our own reading of the record and on what seems to us to to have been the probable impact of the two confessions on the minds of an average jury." Harrington v. California, 395 U.S. 250, 254, 89 S.Ct. 1726, 1728, 23 L.Ed.2d 284.