People of the UNITED STATES ex rel. John J. ROONEY, Petitioner-Appellant,

v.

Vernon G. HOUSEWRIGHT, Warden, Vienna Branch, Illinois Department of Corrections, Respondent-Appellee.

No. 76–2138.

United States Court of Appeals, Seventh Circuit.

Argued Oct. 3, 1977.

Decided Dec. 5, 1977.

John J. Rooney, pro se.

Thomas O. McCulloch, Geneva, Ill., for petitioner-appellant.

William J. Scott, Atty. Gen., Gerri Papushkewych, Asst. Atty. Gen., Springfield, Ill., for respondent-appellee.

Before PELL and WOOD, Circuit Judges, and CAMPBELL, Senior District Judge.*

HARLINGTON WOOD, Jr., Circuit Judge.

In this review of the denial of a petition for habeas corpus, we affirm and adopt the Memorandum and Order of Judge Foreman entered on August 19, 1976, to which we add some additional factual and legal comments.[1]

There is little disagreement about the basic facts which may be briefly summarized.

Late on the night of January 21, 1966, the petitioner, Rooney, shot and killed George Harvill in St. Clair County, Illinois, outside the home of Anita Sarro, the former wife of the decedent but then more recently the girl friend of petitioner. After stopping at a tavern, petitioner had driven Mrs. Sarro home and parked in front. Harvill ran out the front door of Mrs. Sarro's home and up to petitioner's car, appeared to check the license number and yelled he would kill them both. Mrs. Sarro testified she then gave petitioner a .45 caliber pistol, previously given her by petitioner, which she carried in her purse. Mrs. Sarro then got out of the car and went into her house to call the police as petitioner instructed her to do. Harvill made no move to harm her, but retreated from the car to a front corner of her house away from her front door which was closer to the other front corner of the double house. Petitioner at the same time got out of his car and fired a shot at Harvill who continued to run to and around the back of the house while petitioner fired a couple more shots in the air, as he explained, to keep Harvill running. Petitioner then started for Mrs. Sarro's front door, changed his mind, and cut back toward the street so that he could see around the other side of the house. Petitioner saw Harvill crouched along side the house and immedi-

ately ran towards Harvill, firing the final shots. Harvill fell to the ground and died almost at once from the gunshot wounds. Harvill had no weapon. Petitioner waited for the police to arrive.

In the state court trial, petitioner was found guilty by a jury of murder and sentenced to a term of imprisonment of not less than 50 nor more than 99 years.[2] Petitioner sought relief, both by direct appeal and by post-conviction appeal, but to no avail. Our own review of the record reveals no error of constitutional proportions.

We will consider the issues insofar as they are raised in this appeal in the same order as considered in the trial court's memorandum.

## I.

■ The first issue involves an improper inquiry made by the state during direct examination of the sheriff concerning the petitioner's refusal to respond at the time of his arrest to some vague questions from the sheriff. The improper questions and answers could have had no effect on the jury since there was already undisputed evidence in the record that the petitioner had waited for the police to arrive at the scene, admitted to them that he had shot Harvill who was unarmed, and then handed over the gun to the officers. No emphasis was placed on any lack of additional answers from petitioner during the trial. No mention of it was made in final arguments. We concur in the view expressed by the reviewing court in the post-conviction hearing, *People v. Rooney*, 16 Ill.App.3d 901, 307 N.E.2d 216, 219:

Actually, defendant waited for the police at the scene of the shooting, handed over his gun to the police, announced that he had shot a man, and volunteered that he had fired his gun six times. The only

---

* Senior District Judge William J. Campbell of the Northern District of Illinois is sitting by designation.

1. Judge Foreman's unreported Memorandum and Order is attached to this opinion as an Appendix.

2. At oral argument this court was advised that petitioner is now on parole.

evidence submitted to the jury relative to the shooting itself was that of the defendant. Upon his story alone he stood convicted, and the two questions and answers neither added to nor subtracted from the overwhelming evidence of his guilt, nor did they in any way tend to reasonably affect his trial. Under such circumstances we find the error to have been harmless.

In reviewing this record we find the evidence of guilt to be overwhelming. The error was completely harmless. *Harrington v. California*, 395 U.S. 250, 89 S.Ct. 1726, 23 L.Ed.2d 284 (1969); *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).

## II.

The trial court foreclosed petitioner's efforts to offer evidence of Harvill's bad reputation and petitioner's knowledge of that reputation. The trial court held that such evidence was not admissible in the absence of some evidence that Harvill at the time of the shooting appeared to engage in some act of aggression against petitioner or Mrs. Sarro other than the verbal threat which he had no apparent means of carrying out and made no effort to do so. On direct appeal of petitioner's conviction, the Appellate Court of Illinois, Fifth District, 91 Ill. App.2d 46, 233 N.E.2d 440 (1968), in an abstract opinion stated the issue succinctly: "Evidence of reputation of deceased for violent and dangerous disposition is not admissible until evidence is adduced from which it may be inferred that use of unlawful force was imminent, or that defendant reasonably believed that his use of force was necessary to prevent imminent death or great bodily harm to himself or another."

To understand the trial court's ruling, affirmed on appeal, a closer look at the evidence is needed. Since the petitioner and Mrs. Sarro were the only surviving eye witnesses, their own testimony as to the events was accepted. It is undisputed that the decedent had no gun, did not pretend to have one, and made no threatening gestures of any kind. It is also undisputed that as petitioner started to get out of his car, the .45 caliber gun in hand, the decedent retreated at a run toward a corner of Mrs. Sarro's house, and then continued at a run to the back of the house. By the petitioner's own testimony, at this time he fired his first shot at the fleeing defendant, which was likely the shot that hit the decedent in the arm; and petitioner fired several more shots to keep Harvill running. Petitioner testified that he feared at the time he might be "caught in the middle" by a possible friend of Harvill's, if such a friend might be in a car petitioner said was parked across the street. The petitioner's actions, however, evidenced no concern for that possibility. Petitioner did not testify that he saw anyone in the car. Nothing materialized as to another car. After Harvill had run to the back of the house, petitioner started to enter the front door of Mrs. Sarro's home, then changed his mind, went back into the yard angling toward the street for a look around the other side of the house to see if Harvill had gone around the back of the house to the other side. Petitioner saw Harvill toward the back side of the house. According to petitioner, Harvill "took about one step, I guess, when I came around." Again, there is no claim that Harvill did anything threatening, but according to petitioner's own account, as soon as he saw Harvill at the back corner of the house petitioner "started running at him" firing as he charged at Harvill. Harvill was hit two more times, in the neck and back, and spun to the ground. Petitioner testified that he knew he had at least wounded Harvill. Even so, petitioner went on to testify that he kept running at Harvill in order to hit him with the pistol, all the cartridges having been expended, since he did not know how badly Harvill had been wounded. Harvill died on the spot.

■ In spite of the attempts in petitioner's brief to characterize the events as told by petitioner so as to justify the killing, we see them differently. There is not a shred of evidence to suggest that what happened was to any degree in self-defense, regardless of what a bad character the decedent

may have been known to be. From the record it appears that the petitioner, for his own reasons, calmly and deliberately went about the business of killing Harvill. The petitioner's own testimony puts petitioner in the role of an armed aggressor who first shot, without sufficient provocation, a fleeing, apparently unarmed man, and then again charged at him firing to complete the assault, intending to finish him off by using the pistol, a substantial weapon, as a club if need be. That being so, the decedent's reputation and petitioner's knowledge of it were not relevant.

## III.

■ Petitioner now complains that no manslaughter instruction, the lesser included offense, was given by the court. None was offered at trial. The record does not reveal that anyone considered that manslaughter was or could be an issue. The reason for the lack of consideration of that issue is factually obvious.

## IV.

■ The killing, as was to be expected, received press attention locally, but no issue was raised about the publicity at the time of trial. There was no showing that the jurors were in fact exposed to or influenced by the publicity in any degree. For the most part that publicity told little more about the killing than what was admitted in evidence at the trial.

## V.

■ Next, petitioner complains that the assistance of his retained trial counsel was constitutionally inadequate. Although lawyers with the benefit of hindsight might disagree as to the trial tactics to be used, we believe from a review of the entire record that at least minimum requirements were met by petitioner's trial counsel. *United States ex rel. Williams v. Twomey*, 510 F.2d 634 (7th Cir. 1975). Although the petitioner also attacked the competency of counsel connected with the state appeal, that issue was not raised in this appeal.

## VI.

The following instruction on reasonable doubt was given:

The court instructs the jury that a doubt to justify an acquittal must be reasonable, and it must arise from a candid and impartial consideration of all the evidence in the case; and is such that, were the same kind of a doubt interposed in the graver transactions of life, it would cause a reasonable and prudent man to hesitate and pause.

If, after considering all the evidence, you can say you have an abiding conviction of the truth of the charge, you are satisfied beyond a reasonable doubt.

■ The instruction is recognized to be an improper one. A similar instruction was subsequently so held in *People v. Cagle*, 41 Ill.2d 528, 244 N.E.2d 200 (1967), primarily because of the included phrase "to justify an acquittal," which is also the focus of petitioner's complaint about the instruction. Offsetting this, however, we note in this case that the jury was instructed upon the presumption of innocence, and was not once, but twice instructed that, "Throughout this case the burden of proving the guilt of the defendant beyond a reasonable doubt is on the State and the law does not require the defendant to prove his innocence." Further, the jury was instructed that "the burden of proof never shifts to the defendant." In the context of this case, we do not see any possibility that that short phrase in one instruction, which was in no way emphasized, might have contributed in any degree to the conviction. Petitioner relies on *Fahy v. Connecticut*, 375 U.S. 85, 84 S.Ct. 229, 11 L.Ed.2d 171 (1963), but in that case physical evidence, not an instruction, was at issue.

## VII.

■ Finally, the petitioner complains of the way evidence of his prior conviction was introduced, and further of the impeachment use made of it. First, on cross-examination, the state improperly inquired of the defendant if he had not pleaded guilty to

robbery in 1958. Upon objection to this manner of proof of a prior conviction, a certified copy of the conviction record was produced by the state and properly admitted. Thus, there was no resultant procedural harm. There was no further objection to the admission of the record for the customary impeachment purposes. The petitioner would have us hold that evidence of prior convictions should not be admitted for impeachment purposes under any circumstances because of the supposed prejudicial effect on the broader issues. We decline. The jury in this cause was properly instructed upon the restricted and limited use of the prior conviction evidence. Nothing in the record suggests that this limitation was disregarded.

Finding no errors of constitutional proportions justifying reversal, we affirm.

# APPENDIX

___

## IN THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF ILLINOIS

___

THE PEOPLE OF THE UNITED STATES, ex rel. JOHN J. ROONEY,

*Petitioner,*

v.

VERNON G. HOUSEWRIGHT, Warden, Vienna Branch, Illinois Department of Corrections,

*Respondent.*

___

Civil No. 75–3–263

___

## MEMORANDUM AND ORDER

FOREMAN, District Judge:

The Petitioner, presently incarcerated in the Vienna Branch, of the Illinois Department of Corrections, has moved this Court for the issuance of a Writ of Habeas Corpus pursuant to Title 28 U.S.C.A., § 2254. The Petitioner was convicted of Murder, after a jury trial in the Circuit Court of St. Clair County in 1966, and sentenced to a term of imprisonment of not less than 50 nor more than 99 years.

The Petitioner alleges as grounds for Habeas Corpus relief that:

1. His fifth amendment right to remain silent was violated, at trial, when the prosecutor elicited statements from prosecution witnesses that Petitioner had refused to discuss the case with the police at the time of his arrest.

2. He was denied due process when the trial court refused to allow Petitioner to present evidence of self-defense or defense of a third party.

3. The reviewing court refused to consider the evidence to determine whether the evidence would have supported a manslaughter instruction. That Petitioner's constitutional rights were violated because no manslaughter instruction was given, whereas had he been tried by the judge in a bench trial no such instruction would have been necessitated.

4. He was prejudiced by pre-trial publicity and because he was allowed insufficient time to prepare his case.

5. The jury selection was unconstitutional.

6. He was denied effective assistance of counsel at trial.

7. He was denied effective assistance of counsel on appeal.

The Respondent has filed a motion to dismiss the petition alleging that Petitioner failed to exhaust state remedies as required by Title 28 U.S.C.A., § 2254. The Respondent argues that the Petitioner has not filed any petition for post-conviction relief in the Circuit Court of St. Clair County, pursuant to Ill.Rev.Stats., Ch. 38, Section 122–1 *et seq.*, thus contending that Petitioner has failed to meet the prerequisites of 28 U.S.C.A., Section 2254.

With some exceptions, hereinafter noted, the Court feels that the Petitioner has sufficiently exhausted his state remedies and the matter is ripe for federal adjudication. It is no longer required that before a federal court may reach the merits of a habeas corpus petition that Petitioner must have sought relief in each court of the state's hierarchy in which a remedy is available nor show that precisely the issues raised in the federal proceedings were previously raised in the state courts. *Fay v. Noia*, 372 U.S. 391, 83 S.Ct. 822, 9 L.Ed.2d 837 (1963); *Cotner v. Henry*, 394 F.2d 873 (7th Cir. 1968).

Accordingly, the Court will proceed to consider the issues raised by Petitioner seriatim.

### I.

Whether Petitioner's fifth amendment rights were violated during trial by the examination of one of the state's witnesses?

Petitioner's argues that questioning of a state's witness by the Assistant State's Attorney violated Petitioner's fifth amendment right to remain silent. During the trial the following exchange occurred between Assistant State's Attorney, Kenneth Juen, and Sheriff Joseph Maurice concerning a conversation between Petitioner and the Sheriff at the scene of the murder:

"A  I talked to him.

Q  What did he say to you, if anything, and what did you say to him?

A  I don't remember what I said to him, but he did not answer any of my questions.

Q  Did you ask him what had happened?

A  Yes.

Q  What did he tell you?

Mr. Godfrey: Object, if The Court please.

Mr. Juen: What is the basis?

By the Court: He may tell what was said.

Witness: The best of my knowledge, he did not answer any of the questions that I directed to him.

Mr. Juen: So that I understand this right, you asked him questions and he refused to answer, is that right?

A  That is right.

Mr. Godfrey: Objections, and ask it be stricken. He had a right to remain silent, that was his right.

Mr. Juen: We are not quarreling with that, we just want to find out what happened.

By the Court: Overruled. You may cross-examine him on that."

The questions were obviously improper. It is well settled that a defendant's refusal to answer questions at an interrogation cannot be used at trial. *Griffin v. California*, 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965). Further, it was error for the trial court to permit such questioning by the Assistant State's Attorney. However, the Court feels the error was harmless and insufficient to warrant the granting of a Writ of Habeas Corpus. *United States v. Wick*, 416 F.2d 61 (7th Cir. 1969). The Court in *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), held that for error to be harmless it must be "harmless beyond a reasonable doubt." Thus, the question is whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction. *Fahy v. Connecticut*, 375 U.S. 85, 86–87, 84 S.Ct. 229, 11 L.Ed.2d 171 (1963).

Here, the one statement, amidst the overwhelming evidence against the Defendant, could not have contributed to the jury's verdict, nor was the Petitioner prejudiced by such testimony. Consequently, Petitioner's argument must be rejected.

## II.

Whether Petitioner was denied due process when the trial court refused to allow Petitioner to present evidence of self-defense or defense of a third person?

Petitioner sought on several occasions at trial to adduce evidence concerning the deceased's propensity for violent conduct and Petitioner's knowledge of the deceased's violent nature. The Court refused to allow Petitioner to introduce such evidence. Petitioner argues that such evidence tended to establish that he acted in self-defense and that his constitutional rights were violated when the trial court refused to allow such testimony.

Under Illinois Law self-defense is an affirmative defense, and in order for the Defendant to present such a defense, he must present some evidence thereon. Ch. 38, Ill. Stats.Anno., § 3-2, § 7-14. Once some evidence of self-defense is offered by a defendant, the burden devolves upon the State to prove beyond a reasonable doubt that Defendant's activities were not justified by self-defense. *People v. St. Pierre*, 25 Ill. App.3rd 644, 324 N.E.2d 226 (1975). Self-defense (or defense of a third person) is defined in the Illinois Criminal Code as follows:

"A person is justified in the use of force against another when and to the extent that he reasonably believes that such conduct is necessary to defend himself or another against such other's imminent use of unlawful force. However, he is justified in the use of force which is intended or likely to cause death or great bodily harm only if he reasonably believes that such force is necessary to prevent imminent death or great bodily harm to himself or another, or the commission of a forcible felony." Ch. 38, Ill.Stats. Anno., § 7-1.

Thus, the person asserting that he acted in self-defense must show:

(1) That he was not the aggressor;

(2) That the danger of harm was a present one, not merely threatened at a future time, or without the present ability of carrying out the threat;

(3) That the force threatened was unlawful—either criminal or tortious;

(4) That he actually believed the danger existed, that his use of force was necessary to avert the danger, and that the kind and amount of force which he used was necessary; and

(5) That his belief, in each of the aspects described, was reasonable even if it was mistaken. The privilege extends to the protection not only of the person using the force, but of another individual unlawfully threatened with harm.

It is obvious from a review of the record that Defendant failed to sufficiently raise self-defense as an affirmative defense, and, consequently, objections to testimony concerning Petitioner's mental state and the deceased's reputation for violence were properly sustained by the Court. It is uncontroverted that the deceased was not the aggressor and was in retreat at the time he was shot by the Petitioner. The right to defend one's self or another does not permit pursuit and injuring an aggressor after the aggressor abandons the quarrel or is in retreat. The record belies Petitioner's contention that his constitutional rights were violated as a result of the Court's evidentiary rulings. Evidentiary questions are only subject to review by a federal court in habeas corpus proceedings if they constitute a denial of fundamental fairness. *United States, ex rel. Bibbs v. Twomey*, 506 F.2d 1220 (7th Cir. 1974). Such is clearly not the case before the Court.

## III.

Whether the reviewing court properly refused to consider the evidence to determine if a manslaughter instruction was proper

and whether the Petitioner's civil rights were violated because no such instruction was given?

Petitioner contends (1) that a manslaughter instruction should have been given and (2) by not giving the instruction the jury was precluded from considering a possible verdict of guilty to manslaughter which would have been considered had the Petitioner been tried without a jury.

The first issue raised by Petitioner was carefully considered by the Illinois Appellate Court and deserves but a passing comment here. It is well settled in Illinois that "where the evidence is such that it admits of but one of two conclusions, either that Defendant is guilty of murder or is innocent under the law of self-defense, the giving of an instruction and form of verdict on manslaughter is improper . . ." *People v. Newman*, 360 Ill. 226, 195 N.E. 645. At trial neither the State's Attorney nor Petitioner's counsel sought to have a manslaughter instruction given. As stated by the appeals court:

"We assume that both parties were of the opinion that the facts justified either a verdict of guilty of murder or one of acquittal on the grounds of self-defense, and there was no middle ground. From the record, we would tend to agree with this assessment." 16 Ill.App.3rd 901, 307 N.E.2d 216, 220 (1974).

The Court has carefully reviewed the record and finds no error of constitutional dimensions either as to the trial court's failure to give such an instruction or as to the appellate review of Petitioner's argument. It is well settled in habeas proceedings that the failure of the state trial court to instruct the jury on the lesser included offense does not present a federal constitutional question. *Bonner v. Henderson*, 517 F.2d 135 (5th Cir. 1975); *Grech v. Wainwright*, 492 F.2d 747 (5th Cir. 1974); *Alligood v. Wainwright*, 440 F.2d 642 (5th Cir. 1971).

Turning now to Petitioner's contention that a manslaughter verdict could have been considered had Petitioner been tried by the Judge.

The Illinois Post-Conviction Hearing Act provides inter alia:

"Any person imprisoned in the penitentiary who asserts that in the proceedings which resulted in his conviction there was a substantial denial of his rights under the Constitution of the United States or of the State of Illinois or both may institute a proceeding under this Article." Ch. 38 Ill.Rev.Stats., Par. 122–1 (1969).

The Petitioner raises this issue for the first time in his petition before this Court. In view of the fact that the Petitioner has failed to exhaust his available state remedies, by failing to institute proceedings under the Illinois Post-Conviction Hearing Act, as to this issue, which the Court finds would have been an adequate remedy, effective and available, and since this allegation does not reflect a sufficiently exceptional case, which would require this Court to obviate the doctrine of exhaustion of available state remedies, the Court must reject Petitioner's contention.

Even assuming that Petitioner effectively exhausted his available state remedies, the argument lacks merit and fails to raise an issue of constitutional dimensions. It is obvious from a review of the record that neither the attorneys nor the Court felt that the evidence supported the giving of a manslaughter instruction. Consequently, Petitioner's argument begs the question. For if the Judge felt that the evidence did not support the giving of such an instruction, *a fortiori* it would not follow that the Judge would have considered a manslaughter conviction had he been the trier of fact.

## IV.

Whether Petitioner was denied a fair trial because of pre-trial publicity and the fact that Petitioner's trial was held only 7 weeks after the commission of the crime in question?

Neither Petitioner nor his attorney requested a continuance prior to trial based upon inadequate time to prepare for trial. When the case was called for trial on March 14, 1966, the Petitioner announced ready for

trial. The only motion for change of venue was directed against the trial judge. The motion was promptly allowed and another judge assumed the handling of the case. The record belies the Petitioner's contentions of inadequate time to prepare for trial and Petitioner's argument lacks constitutional magnitude.

Turning to Petitioner's argument with regard to prejudicial pre-trial publicity. The Court has reviewed the entire record, including the exhibits attached to Petitioner's post-conviction petition. The record reflects and Petitioner admits that this issue was first raised during post-trial proceedings and was not presented to the trial court prior to trial. It is apparent that the pre-trial publicity issue was but an after-thought on Petitioner's part, and the Court is unable to conclude after a review of the record that Petitioner's argument raises an issue of constitutional magnitude. For Petitioner's contention to be of merit, it would be necessary to conclude that the jurors were both exposed to the alleged adverse publicity and were prejudiced thereby. "It is not sufficient to simply allege adverse publicity without a showing that the jurors were biased thereby." *Ignacio v. People of Territory of Guam*, 413 F.2d 513, 518 (9th Cir. 1969) cert. denied, 397 U.S. 943, 90 S.Ct. 959, 25 L.Ed.2d 124 (1970).

### V.

Whether the method of selection of members of the Grand Jury and Petit Jury was unconstitutional and as a consequence Plaintiff's conviction should be negated?

Petitioner argues that his constitutional rights were violated by the method of jury selection utilized at the time of his conviction. He attacks both the method of Grand Jury and Petit Jury selection. Petitioner failed to challenge the method of jury selection until after his conviction. The only explanation offered by Petitioner for his failure to object to the method of jury selection was that he had no knowledge of the method used until after his trial. The method of selecting jurors then in use was the same system employed by the Court for

years prior to Petitioner's trial. No reason has been given why neither Petitioner or his attorney could not have ascertained all of the facts necessary to present the objection prior to trial. The Petitioner effectively waived any objection to the jury panels by not objecting to their selection prior to trial. Further, neither the record nor Petitioner's argument demonstrate that Petitioner was prejudiced by the manner of jury selection, and such allegations fail to raise issues of constitutional magnitude for consideration by this court.

### VI.

Whether Petitioner was denied effective assistance of counsel at trial?

Petitioner alleges that his constitutional rights were violated as a result of ineffective assistance of counsel at trial, in that his counsel (1) failed to move for change of venue, (2) forgot to make an opening statement, (3) failed to make objections to the instructions, and (5) [*sic*] failed to tender certain instructions Petitioner feels were appropriate. It would serve no useful purpose to elaborate separately on each of Petitioner's charges. Suffice it to say that after a review of the record in this case the Court feels Petitioner's argument is clearly without merit. Petitioner was represented at trial by retained counsel. Although his attorney may have made some tactical decisions which other counsel would not have made, the record reflects that he vigorously and ably defended the Petitioner in the face of strong evidence of guilt. Retrospective disappointment with the manner in which the hearing was conducted does not alone suffice to prove deprivation of one's constitutional right to assistance of counsel.

A defendant in a criminal trial is entitled to be represented by an attorney who exhibits a minimum degree of professional competency. *Matthews v. United States*, 518 F.2d 1245 (7th Cir. 1975); *United States v. Jeffers*, 520 F.2d 1256 (7th Cir. 1975); *United States, ex rel. Williams v. Twomey*, 510 F.2d 634 (7th Cir. 1975). The Court has reviewed the entire record in this case and can find nothing in the record which is

inconsistent with the minimum standards of professional conduct as delineated by the Court of Appeals in the previously cited cases. The Petitioner now, after some ten years since his trial, concludes that his attorney's services were insufficient. Petitioner's attorney was an experienced criminal lawyer, presented a vigorous closing argument, called witnesses in Petitioner's behalf, and vigorously cross-examined key prosecution witnesses. After a complete review of the record, this Court is unable to conclude that Petitioner's representation was so ineffective as to be of constitutional dimensions.

## VII.

Whether Petitioner was denied effective assistance of counsel on appeal?

Petitioner argues that due to his counsel's failure to raise certain issues on appeal his constitutional rights were violated and their prayer for relief should be granted.

Again, it would serve no useful purpose to specifically treat each such allegation. The record clearly reflects that Petitioner was adequately and ably represented on appeal, that he received a just and fair hearing as to the issues appealed, and that his argument is without merit. In addition, the Petitioner has failed to exhaust his post-conviction remedies on this issue before the State Court. His assertion of ineffective counsel warrants no further consideration by this Court.

## CONCLUSION

The Court has reviewed the entire record, including the Reporter's transcript and the opinions by the state courts, both trial and appellate, and feels that sufficient documentary evidence is before the Court for disposition of the petition and that no evidentiary hearing is required.

This Court is of the firm opinion that Petitioner's petition presents no meritorious grounds for relief; that his conviction

should stand; that his constitutional rights were not violated; and that his petition and the record in this case conclusively show that the Petitioner is entitled to no relief under Title 28, Section 2254, United States Code.

IT IS THEREFORE ORDERED that Petitioner's petition for relief, pursuant to Title 28, Section 2254, United States Code be and the same is hereby denied.

ENTERED this 19th day of August, A.D. 1976.

PELL, Circuit Judge, dissenting.

Occasionally a judicial opinion affirming a criminal conviction will contain the observation that a defendant has no constitutional entitlement to a perfect trial but merely to a fair trial.[1] The appellant in the case before us did not in my opinion have a fair trial in the constitutional sense and I therefore respectfully dissent.

In arriving at my firm belief that the appellant was deprived of a fair trial I need look no further than the first two issues discussed in the majority opinion, which when considered in tandem, although in reverse order from that in the majority opinion, demonstrate quite clearly, in my opinion, that the appellant was prevented from a meaningful presentation of what might well have been a successful defense of the criminal charge of murder.

Rooney was convicted in 1966 after a state court jury trial of murder. He was sentenced to a term of imprisonment of not less than 50 nor more than 99 years. There is no question that he intentionally fired the gun which caused the death of George "Stormy" Harvill and that on the occasion of the fatal shots he was aiming the gun at Harvill. Other than the defense of mental incompetency which he did not claim, Rooney's only defense would appear to be that of self-defense, which he attempted to assert but unsuccessfully so because the trial judge had concluded "there was no evidence

---

1. As a matter of record, such a statement was made by the Appellate Court of Illinois in its opinion denying Rooney postconviction relief.

*People v. Rooney*, 16 Ill.App.3d 901, 307 N.E.2d 216, 221 (1974), *cert. denied*, 419 U.S. 1025, 95 S.Ct. 503, 42 L.Ed.2d 300.

there was any assault to entitle him to use self-defense."

In considering the present matter I agree that applicable state law is as propounded by the district court in its Memorandum and Order:

Under Illinois Law self-defense is an affirmative defense, and in order for the Defendant to present such a defense, he must present some evidence thereon. Ch. 38 Ill.Stats.Anno., § 3–2, § 7–14. Once some evidence of self-defense is offered by a defendant, the burden devolves upon the State to prove beyond a reasonable doubt that Defendant's activities were not justified by self-defense. *People v. St. Pierre*, 25 Ill.App.3rd 644, 324 N.E.2d 226 (1975). Self-defense (or defense of a third person) is defined in the Illinois Criminal Code as follows:

"A person is justified in the use of force against another when and to the extent that he reasonably believes that such conduct is necessary to defend himself or another against such other's imminent use of unlawful force. However, he is justified in the use of force which is intended or likely to cause death or great bodily harm only if he reasonably believes that such force is necessary to prevent imminent death or great bodily harm to himself or another, or the commission of a forcible felony." Ch. 38, Ill.Stats.Anno., § 7–1.

Thus, the person asserting that he acted in self-defense must show:

(1) That he was not the aggressor;

(2) That the danger of harm was a present one, not merely threatened at a future time, or without the present ability of carrying out the threat;

(3) That the force threatened was unlawful—either criminal or tortious;

(4) That he actually believed the danger existed, that his use of force was necessary to avert the danger, and that the kind and amount of force which he used was necessary; and

(5) That his belief, in each of the aspects described, was reasonable even if it was mistaken. The privilege extends to the protection not only of the person using the force, but of another individual unlawfully threatened with harm.

I now turn to the evidence in this case in the light of the above applicable law. Shortly after 2 a. m., Rooney and Anita Sarro approached in Rooney's automobile a small duplex house in which Sarro resided with her two children, ages 9 and 12, children by a marriage prior to that with Harvill. She had been divorced from Harvill for approximately one month at the time. Rooney had never met Harvill but knew that Harvill had "beat up" his former wife during the preceding week and she was afraid of Harvill because of this and other occurrences. When Rooney started going out with Sarro they had gone to St. Louis rather than in the Illinois area to avoid encountering Harvill. Rooney knew from Sarro that Harvill sometimes carried a gun. Rooney had given a gun to Sarro which she carried in her purse so that she could scare Harvill in the event he attempted to bother her. On the evening in question shortly after their arrival at the Sarro residence, Harvill emerged out of the Sarro house yelling at them. Specifically, he yelled, "I'll kill you, I'll kill you, I'll kill you both."

Rooney and Sarro did not know whether Harvill had a gun with him at the time although after his death it was learned that he did not. Rooney was unable to see Harvill's hands, and it probably does not need to be said that hindsight was not yet available to him at the time. Rooney did testify that he assumed that Harvill had a gun but this testimony was stricken upon objection. He was informed by his counsel that he could not say that he "assumed," to which he responded that he would not have shot at him if he "didn't think he did." This also was stricken. Rooney told Sarro to go into the house and to call the police which, it must be observed, seems scarcely consistent with embarkation upon a planned homicide. He asked her for the gun which she gave to him. Rooney then emerged from the car with the gun in hand and Harvill retreated to a corner of the house. Rooney fired one shot at him upon which Harvill started run-

ning down the alley on one side of the house. As Harvill retreated, Rooney fired shots over his head. Rooney then started in the house with the purpose of removing Sarro and her children to safety. Before entering, however, he turned back to see if Harvill had returned to the area. When he went to the other side of the house he found Harvill crouching and coming around toward the front. It is difficult to conceive that a person who had several shots fired at him would promptly return to the area instead of continuing on his course away from the area, unless he had in mind some sort of confrontation.

It was after Harvill took a couple of steps towards Rooney that he started shooting at him again and hit him. Three shots were fired upon which Harvill fell to the ground and apparently shortly thereafter died.

In considering the tests it had outlined, as set out above, the district court stated it was uncontroverted that the deceased was not the aggressor and was in retreat at the time he was shot by the petitioner. I cannot find that this is supported by the record unless "aggressor" refers only to the immediate situation at the time the fatal shots were fired and, of course, if this is the narrow scope of that term then the person engaged in self-defense could never establish that defense because it only comes about when it has been exercised with dire results to the person against whom the defense was being launched. Harvill was not in retreat at the time he was shot by Rooney but indeed had come around the house and was again approaching Rooney. It takes no distorted reasoning to believe that being aware that Harvill sometimes carried a gun, that he had just previously visited violence upon his ex-wife, that he had immediately upon Rooney's arrival at the scene threatened three times to kill both occupants of the automobile and that he did not continue to retreat away from the scene after having shots fired at him and over his head, Rooney was in real fear for his life. There was certainly ample reason for Rooney to believe that the danger of harm to himself or to Sarro was a present one and that it was necessary to use the force which

he did. As the district court pointed out, if the belief is reasonable it may be nevertheless mistaken as it may have been in this case.

Nevertheless, the jury found Rooney guilty and it is at this point that the first two issues discussed in the majority opinion become important. The first of these is that the defense was not permitted to show the reputation of Harvill for violent and dangerous disposition. The Appellate Court of Illinois in its abstract opinion on the direct appeal of petitioner's conviction stated, as set forth in the majority opinion, the applicable law as follows:

Evidence of reputation of deceased for violent and dangerous disposition is not admissible until evidence is adduced from which it may be inferred that use of unlawful force was imminent, or that defendant reasonably believed that his use of force was necessary to prevent imminent death or great bodily harm to himself or another.

While Rooney was permitted to testify that he had learned about the violent nature of Harvill as related to him by Sarro, this testimony was of a potentially suspect character under the circumstances because it came from a divorced wife upon whom Harvill had visited considerable difficulty and from a vitally interested party to the particular litigation who was on trial on a murder charge. As a matter of fact, Rooney was not permitted to testify that he was familiar with the reputation of decedent as being a violent, dangerous, quarrelsome man, or that he knew Harvill usually went about carrying a gun and had been arrested and pleaded guilty on a charge of carrying a gun and had been arrested and pleaded guilty on a charge of carrying a concealed gun and had been interrogated as a suspect in one murder case and had been charged with murder in another case.

More to the point for the present purpose, however, is that the chief investigator of the Sheriff's Office, Joseph Rodriguez, was called as a witness and was asked whether he was aware of the reputation of Harvill

for being a violent, dangerous, and quarrelsome man. Objection was sustained, upon which the offer of proof was that the witness would have answered in the affirmative which would have been based upon the number of times Harvill had been arrested for carrying concealed weapons, upon his being a suspect in murder cases and upon other charges against him. Objection was made on a foundation ground but the court's ruling was that there was no evidence in the record indicating the decedent committed any act of aggression other than words and for that reason any evidence as to the reputation of the decedent for violence or quarrelsomeness was not admissible.[2] The defense counsel was told that the same ruling would apply to any other witnesses that might be presented on this matter. The defense then made the following offer of proof:

> The following witnesses would testify that they are familiar with the general reputation of the decedent for being a dangerous, violent and quarrelsome person in the area in which he resided and that that reputation was bad, that he was a dangerous, violent and quarrelsome person: Walter Moehle, head of the local department of the Federal Bureau of Investigation; Chief—Sergeant Jack Gray of the East St. Louis Police Department and chief investigator for the State's Attorney's Office; and Charles Stewart, news editor of the Metro-East Journal.

It is granted, of course, that John J. Rooney and not George Harvill was on trial but on the other hand this testimony if admitted would have reflected directly upon the reasonableness of Rooney's belief that in this small hour of the morning in the surrounding darkness when the person fired at had returned to the scene he was actually in danger of being killed himself. Evidence from these disinterested sources of the dangerous, violent, and quarrelsome nature of Harvill could not have other than supported the reasonableness of the belief and would not have left the matter merely

to the credibility of the two witnesses, Sarro and Rooney, as to what type of an individual was confronting them at this time of the morning.

The deficiency in the defense resulting in the court's ruling was compounded by the triple reference to the fact that Rooney did not say anything to the police when they arrived at the scene.

The transcript reflects the following:

Q While you were there did you have conversation of any sort with the defendant?

A I talked to him.

Q What did he say to you, if anything, and what did you say to him?

A I don't remember what I said to him, but he did not answer any of my questions.

Q Did you ask him what had happened?

A Yes.

Q What did he tell you?

Mr. Godfrey: Object, if the Court please.

Mr. Juen: What is the basis?

By the Court: He may tell what was said.

Witness: The best of my knowledge, he did not answer any of the questions that I directed to him.

Mr. Juen: So that I understand this right, you asked him questions and he refused to answer, is that right?

A That is right.

Mr. Godfrey: Objection, and ask it be stricken. He had a right to remain silent, that was his right.

Mr. Juen: We are not quarreling with that, we just want to find out what happened.

By the Court: Overruled. You may cross-examine him on that.

The courts who have reviewed the Rooney case, including both the district court and the majority opinion in this court, have

---

2. Insofar as technical grounds of objection are concerned, these, of course, can be obviated by rephrasing. Here, however, the objection was

sustained upon grounds which were not susceptible of being overcome.

agreed upon the impropriety of the witness, over objection and without any cautionary instruction, stating three times that Rooney did not answer any of the sheriff's questions. Nevertheless, despite the admitted impropriety, the reviewing courts heretofore, including the majority opinion in this court, have attempted to bury this severe prejudicial violation of Fifth Amendment rights in the "harmless error" doctrine.

This court has on two occasions in comparable situations found that this error is so prejudicial as not to permit the application of the "harmless error" theory.

In *United States v. Kroslack*, 426 F.2d 1129 (7th Cir. 1970), an FBI agent after giving a *Miranda* warning testified that the defendant said he did not have anything to say. In *Kroslack*, the trial court struck the testimony from the record, informing the jury that the fact that the person refused to discuss a matter with a government agent was no evidence of anything. As contrasted with *Kroslack*, in the case under consideration the trial court appeared to think that this type of testimony was entirely proper and could be countered on cross-examination. This, of course, would completely subvert the Fifth Amendment rights, particularly if the defendant had not answered any questions because obviously his counsel would not then go into cross-examination on the matter. In *Kroslack*, the matter was returned to again upon which the agent answered that he was basically giving the same answer that was stricken from the record. A second motion for a mistrial was denied but no cautionary instruction was given to the jury and this court reversed. It is true in *Kroslack* that the court observed that the evidence against the defendant was thin on the record.

The evidence was not thin, however, in *United States v. Matos*, 444 F.2d 1071 (7th Cir. 1971). In that case Matos, a postal employee, on request emptied his pockets which produced a stolen watch. He was arrested and was given the *Miranda* warnings. The Government attorney asked, "Now, after this, did you tell the defendant anything?" The postal inspector unresponsively answered that Matos "indicated he did not desire to make a statement."

The *Matos* case is substantially parallel to the case at bar in that Matos testified at the trial that he did not intend to steal the watch and had accidentally stepped on a box which contained it, put it in his pocket with the intention of returning it to the platform office but had been brought to the inspector's office before he could turn the watch in. The underlying rationale in the *Matos* opinion is that because his credibility as a witness was involved in his explanation of why he had the watch in his possession, this credibility was weakened by the jury knowing that he had not offered this explanation at the time he was confronted by the postal inspectors. Likewise in the case at bar Rooney's testimony supporting his claim of self-defense was subject to the same weakening effect if the jury thought that he did not tell the investigating police officer that he was defending himself and Sarro. Putting it another way, if a person was engaged in defending himself and during the course thereof killed somebody it would be natural that he would proclaim this fact vigorously and quickly to the investigating police officers. At least, the jury could so reason. But here the jury was told three times, apparently with the court's blessing, that he said nothing to the sheriff.

In *Matos* this court held that the harmless error doctrine was not sufficient to obviate the prejudicial violation of the Fifth Amendment rights.

While it is true in the present case that the prosecution did not advert to the fact of this particular testimony in final argument, I find as a final matter some considerable significance in the closing argument made by the state prosecuting attorney. After hearing the closing argument by the defense counsel the prosecuting attorney began his argument as follows:

I am somewhat perplexed and a little saddened by the turn of the argument in this case. If I understand the defendant's defense that you good people are asked to accept here, it is to the effect

that the defendant, Rooney, had the right to take the life of Harvill in order to free Mrs. Sarro of whatever burden she had with Harvill.

This twisting of the defense theory into one of just freeing the life of a girlfriend from the unpleasantness of an ex-husband is far removed from a defense of self-defense which was rendered considerably less effective than it should have been by the rulings of the trial court.

Further, the prosecutorial characterization of Rooney's motivation became more likely of acceptance by the jury which was not permitted to have on their balancing scales the full information as to Harvill's dangerous character.

I would therefore grant the writ.